HELEN M. MESSENGER v. St. PAUL CITY RAILWAY COMPANY
and Another.

June 14, 1899.

Nos. 11,047—(163).

### Street Railway—Joint Operation of Line—Both Companies Liable.

On the evidence, *held*, that the St. Paul City Railway Company and the
Minneapolis Street Railway Company were jointly operating the Inter-
urban Line, partly owned by each, and connecting the two cities, and
each one is liable for the acts and omissions of the other in operating the
same.

### Evidence Improbable—New Trial—Discretion of Court.

*Held*, the uncorroborated evidence of the plaintiff on the vital and es-

sential point in the case is so inherently unreasonable and improbable that the trial court abused its discretion in failing to grant a new trial.

Action in the district court for Ramsey county against the St. Paul City Railway Company and the Twin City Rapid Transit Company to recover $9,000 damages for personal injuries. The case was tried before Bunn, J., and a jury. On motion of defendant the case was dismissed against the Twin City Rapid Transit Company. The jury rendered a verdict in favor of plaintiff for $875; and from an order denying a motion for judgment notwithstanding the verdict, or for a new trial, defendant appealed. Reversed.

*Munn & Thygeson*, for appellant.

*Stringer & Seymour*, for respondent.

CANTY, J.[1]

The corporate limits of Minneapolis and St. Paul join. A street-railway line extends from the business center of one city to the business center of the other, known as the "Interurban Line." This line is nearly ten miles long; a little less than three miles of it being within the corporate limits of Minneapolis, and the other seven miles within the corporate limits of St. Paul. The part in Minneapolis is owned by the Minneapolis Street Railway Company, and the part in St. Paul by the St. Paul City Railway Company. Each company procured its franchise from the city in which its part of the line is situated. The street cars run through from one end of the line to the other without change, and two fares, of five cents each, are charged for the through trip. One of these fares is collected in Minneapolis, and the other in St. Paul. There is another corporation known as the Twin City Rapid Transit Company, which owns and holds in its own name 98 per cent. of the capital stock of each of the other two companies, but takes no part in the actual management or operation of any of the properties or lines of either. This was the condition on October 16, 1897, when plaintiff boarded an Interurban car in St. Paul for the purpose of riding through to Minneapolis. She paid the two fares at the proper time, was injured in leaving the car at her destination in

[1] COLLINS, J., absent. BUCK, J., did not vote.

Minneapolis, by reason, as she claims, of the negligence of the employees operating the car, and brought this action against the St. Paul Company and the Rapid Transit Company to recover damages for such negligence. On the trial the court dismissed the action as to the Rapid Transit Company, and plaintiff had a verdict against the St. Paul Company, and from an order denying a new trial the latter appeals.

1. Appellant contends that the Minneapolis Company and the St. Paul Company were each operating its part of the line merely as a connecting carrier, and the St. Paul Company is not liable for negligence on the part of the line in Minneapolis resulting in injury to a passenger on that part of the line. On the other hand, respondent contends that the two companies were operating the whole line as partners, or, at least, under such arrangements as made them jointly liable, each for the acts of the other. In our opinion, the latter contention is the correct one, or at least the jury were warranted in so finding. Besides the facts above stated, it appears from the evidence that the two companies own the cars jointly, each having a half interest therein. The cars are run through from one terminus to the other by the same conductors and motormen, who receive their wages, one-half from each company. On one side of each car are the words, "Minneapolis and St. Paul;" on the other side, "St. Paul and Minneapolis;" on the front of each, the word, "Interurban." The St. Paul Company takes the five-cent fare collected in St. Paul, and the Minneapolis Company the five-cent fare collected in Minneapolis. Snelling avenue is three miles east of the line dividing the two cities, and a passenger may take a car at any point west of that avenue and ride through to Minneapolis for one fare of five cents, all of which is credited to the Minneapolis Company, although three miles of the ride may be over that part of the line owned by the St. Paul Company.

On this evidence, we are of the opinion that the jury were warranted in finding that the two companies were operating the line jointly in such a manner as to make one liable for the acts and omissions of the other. See Hutchinson, Carr. (2d Ed.) §§ 158–162a.

2. But we are of the opinion that plaintiff's uncorroborated testimony as to the manner in which she was injured is, in itself, so un-

reasonable and improbable that the trial court abused its discretion in refusing to grant a new trial.

Plaintiff testified: That she desired to leave the car at Pleasant avenue in Minneapolis. That, as the car approached that avenue, she signaled the conductor to stop the car, which he did. That she carried a satchel, a bag, and an umbrella, and with these in her hands she went down the aisle to the rear of the car. As she came down the aisle, she was afraid she was going to get hurt. She put her hand on the railing, and as she was about to step from the platform down onto the first step, to get off, some one called out: "All right. Go ahead." She drew her foot back, and just then the car started forward, and she was thrown off sideways from the platform, clear over the steps and through the open gates, and beyond them onto the ground, a distance of about four feet to one side, and more than three feet downward. She landed on her feet in the mud, and then fell on her knees in the mud,. She never touched the steps as she passed over them, and never touched the ground until she reached the place where she came down on both feet, outside of the open gates. During this time the conductor stood in the middle of the car. It is not claimed that any motion whatever was imparted to the car, except that of starting quickly forward. It is not claimed that any one pushed her off the platform, or that she jumped off or stumbled off, but still she went out "as if shot out of a gun." She testified:

"I got up and walked as rapidly as I could—because I had a feeling I was afraid I was going to get hurt—to the end of the car. * * * I took hold of the brass rod that was on the end of the car, and I went to look to be careful to get my foot right going down, and just before I reached that step someone hollered out: 'All right. Go ahead.' And that frightened me, and I went to pull my foot back; but before I could get my foot back the car started very swiftly, as it naturally would when the brakes were loosened there, and I went out,—well, so quick that, if I was shot from a gun, I couldn't have gone faster. But I struck on my toes, like, and I went forward onto my knees, I judge. I never knew from the time I struck my feet until afterwards, but my dress— I struck in a mudhole,—quite a deep mudhole,—and my dress was covered all over my knees with mud; and I couldn't clean it off, nor my people couldn't, and I had to send it to a cleaner and have it cleaned. So I think I struck on my feet, and that is the reason I never had any

feeling, much, in my toes since. Q. You struck on your feet. Then how did you go? A. Front onto my knees, because my dress was covered with mud so, and the mud was above my shoe tops and probably about so far (indicating) on my stocking. It was a deep mudhole. If it hadn't been for that I wouldn't be here to-day. Q. How far was it, Mrs. Messenger, from the platform to the ground? A. I don't know the height of those cars, but I should think it was four or five feet. I don't know how high they are from the ground. I never measured them. They are pretty high. Q. When you fell on the ground, where were you standing? A. I went straight from that side,—on this left side,—right over the steps, and struck the ground. Q. The side of what? A. Of where we go down the steps. Q. The platform? A. Of the platform. I was nearest to the car,—nearer the car than I was on the right side, you know; and this gate— I saw the gate coming, and I thought—didn't think much—I was afraid it would hit me; and it picked this umbrella off from my arm, and it stuck in the gate; and I don't know what made me, but that umbrella worried me so after I— There was a boy tried to lift me up, that clerked in the store there,—I come to, then, when he was trying to lift me up,—and he couldn't carry me. * * * I went straight out clear over the steps. Q. You didn't jump out, did you? A. No; I guess not. Q. You are quite sure about that? * * * A. I am very sure. That is the last thing I would attempt to do,—to jump off a car. Q. I suppose so. I haven't any doubt about it at all. You are sure you didn't jump out? A. I was thrown out,—just as straight and as swift as though I had been shot from a gun. Q. Did you strike the gates at all? A. The left gate struck me. Q. The left gate struck you? A. On my left side. Q. As you were going out? A. Yes; and took this umbrella off from my arm, and it hung on the gate, and the conductor got it and brought it to me; and, if you want to know the swiftness, here was a little place turned up, then those are round wires on that gate, and it cut that edge and that broke it. If you want to look at it, you can. Q. And is that the umbrella? A. That is the umbrella. I kept it on purpose to show the speed. Q. Did you see the umbrella on the gate? A. Yes, sir; when they were carrying me, I looked towards the car,—when they were carrying me in the store,—and I saw the umbrella— Q. Hanging on the gate? A. Yes. * * * Q. When they picked you up you looked down towards the car, and you saw your umbrella hanging on the gate? A. Yes. Q. Which gate was it hanging on? A. On the one on the left side. Q. You saw that, did you? A. I didn't think about that, but I saw the umbrella was there, but I know that the left-hand gate picked it off of my arm. Q. And you saw it hanging on the left-hand gate? A. I saw it hanging on the gate of the car. I could see my umbrella was there, and I told the conductor— Q. You saw that, did you? A. Yes, sir; and it wor-

ried me all the time about the umbrella— Q. Why were you worried about it when you saw it hanging there? A. Well, I tell you I thought it was a providence, to show the speed I was thrown off. That shows the speed— Q. That worried you. You said you worried about it. What worried you? A. Well, I wanted to get it. Q. Then you were not thinking about your injuries, but about the umbrella? A. That umbrella was in my mind very distinctly. It is a very curious thing, but it was. Q. And you were worried about it all the time? A. No; I didn't say I was worried about it all the time. I wanted it, and I asked the conductor to bring it to me, and he did. * * * After I got in the store, I said: 'My umbrella is hanging on the gate. You bring it to me.' * * * Q. Now, the left-hand gate, you say, struck your left arm? A. Yes. Q. And that is the only thing that did strike you? A. That I knew of. * * * I was going down, and that umbrella was on my arm, and the gate picked that off my arm; and, of course, I fell away and left it. I was going down, and naturally my arm would pull down. Q. Just slipped out from under it, and left it hanging on the gate? A. It will do it. If you want to try it, you can do so. Q. You didn't touch the step, then, did you? A. I don't think I did. I went into a mudhole outside of the track. Q. Did you realize when the gates were shut? A. The gates were shutting as I was going down. You understand it was but an instant. I can't tell you every motion that is made. Q. The gates were closing as you were going out? A. As I was going out. Q. And yet you didn't touch either one of them, except to hit the left arm? A. The left one. The other gate, you know, I was farther from, and I had that satchel on my side. Whether it hit the satchel or not, I don't know. I never saw any marks on it, and I did not feel the right-hand gate touch me, but I did the left."

The right-hand gate is the rear gate, and, if she had not landed clear outside the gates, that gate must have struck her as the car moved along and the gate was swung in in closing it. She testified that this gate may have struck her, for the reason that she immediately, and for a long time afterwards, had a sore spot on her back, between her shoulders, along her spine. As to the character of her injuries she further testified:

"It was a wrench, and it affected me all over, and when I turned my head it seemed to me that my brain settled down whichever way I turned my head, as though it was loose in the skull; but I got over that in three or four weeks, so that I didn't feel that way when I moved my head. I got a terrible jar and strain. Q. How long did you remain in bed? A. Three weeks. And then they lifted me up, and put pillows in a chair, and put me in a rocking chair. Q.

Now tell the jury about that. Were you able to get up before the expiration of three weeks? A. Oh, no; I couldn't get up alone at the end of three weeks. Q. Where did you suffer the greatest pain during the three weeks? A. Oh, dear! Q. What's that? A. If any one tried it, they could tell; but it is hard to tell it to any one else, when you are hurt all over like that. Q. Well, are you able to tell the jury whether in any one part you experienced more pain than any other part? A. Well, the sorest places was low down on my back, below the kidneys, quite a ways, and up between my shoulders, where I think the corner of the gate must have hit me, right in the side of my backbone, and then it affects my lungs (coughing), and keeps me coughing whenever I am tired or whenever I talk long yet. My back here (indicating) I don't feel it, nor I don't feel it here; but right in here, Dr. Alger says he found a place, and he put his two fingers there, and it hurt me terribly, where it was injured. * * * Q. You say that has hurt you to this day? A. Yes, sir. Q. Continuously? A. Continuously. Never has stopped being sore and hurting. * * * I didn't go out of doors, I guess, for 11 weeks."

Dr. Alger was called as a witness by plaintiff, and he testified as follows:

"Q. State to the jury what condition you found her [plaintiff] in the first time you called to see her? A. It was directly after the accident. She was in a nervous—very nervous—condition. Complained of pain in her side, of an injury in the side, and of the limbs. I made a thorough examination. There was no external showing of any trouble whatever. I think on the right leg, if I remember rightly, there was a little scratch or bruise; but, so far as the side was concerned, there was nothing visible. She complained of this pain, and, of course, was under great excitement at the time. I gave her, I think, Nervine. I didn't think she was in sufficient pain to give her a narcotic, so I gave her simply Nervine, as I recollect it, and then left it, if they needed me further, to call me. This was the first night. Q. Did she complain of her back? A. Yes, sir; complained of wrenching through the left side; well, from just below the ribs clear down through the side. Q. Was she in bed or not? A. Yes; she was lying down in the bed. Q. What was her temperature? A. Her temperature was normal at that time, or nearly so. I would not say that I took her temperature. Q. How about her feet and hands? A. Well, they were cold, but that was from the effect of the shock. I saw she was under excitement. Q. You say that her hands and feet were cold from the effect of a shock? A. Probably; that would be a natural occurrence. Q. That is what you would expect to be the cause of it? A. Certainly."

He testified that he called three or four days later, and found her somewhat better. He did not see her again for seven or eight months. In July, 1898, she was examined and treated by Dr. Sweeney, who testified on her behalf that he then found her suffering with diabetes. He testified that the cause of diabetes is not always known; that it might be caused by injuries to the head, or by general concussion; that her injury might be the cause of her condition; that he would not necessarily attribute the diabetes to her injury; that the diabetes might be caused by old age.

Plaintiff's evidence as to the manner in which she left the car is wholly uncorroborated.

Defendant called three witnesses, apparently disinterested, who testified that they were passengers on the same car. One stood on the platform, and the other two sat on the rear seats, one on each side of the aisle. They testified that the plaintiff walked down the steps, and was upon the ground when the signal was given to start the car. No one of them saw her afterwards until some one shouted to stop the car; that the woman had fallen down. She was then in the mud, but how she came there they could not tell.

Plaintiff was then a widow, 66 years old. She testified that she was a pension agent; a real-estate agent; collected pensions and rents, and looked after estates for other people. The jury gave her a verdict for $875.

We cannot say that defendant was not guilty of negligence which might have caused or contributed to her injury, if it appeared by some half-credible evidence just how she was injured. But, if we reject the part of plaintiff's story which is highly improbable, there is not enough left on which to sustain a verdict. It is highly improbable that she was thrown from the platform of the car out onto the ground in the manner which she testifies. Reject this part of her evidence, and we have the simple fact that, after leaving the car and landing on the ground, she either fell down or was thrown down. This alone will not support the verdict. She alone can tell just how she fell down or was thrown down, but she refuses to tell, except as she tells something which is highly improbable. If she had since died by reason of injuries then received, and the action was brought by her personal representatives, her mouth would be

closed, and the circumstantial evidence in the case would then be given great weight; and might perhaps be sufficient to sustain a verdict against defendant. But she is not dead. She is living, and able to testify, and her statement as to how she was thrown from the car negatives any and all inferences which otherwise might be drawn as to how the injury occurred. Her case rests upon the assumption of the absolute verity of her statement. For this reason the mere proof that she fell down or was thrown down and injured immediately after leaving the car would not, in the absence of an explanation from her as to how it happened, support a verdict in her favor. She makes an explanation as to how it happened, but her explanation is highly improbable.

We cannot say there is not some evidence to support the verdict. But her uncorroborated evidence on the essential and vital point in the case is so inherently improbable and unreasonable that in our opinion the trial court abused its discretion in refusing to set aside the verdict, and grant a new trial. See Voge v. Penney, 74 Minn. 525, 77 N. W. 423. This rule can be applied by this court only in extreme cases. But when such a case is presented the court should not hesitate to act. The court which refuses to do anything to correct the abuses of the jury system is one of the worst enemies of that institution. Such a court is doing what it can to pave the way for the abolition of the jury system, the establishment of "government by injunction," and the establishment of a one-man system, in which the judge who acts as a jury will be altogether too liable to be selected, controlled, or influenced by great corporations and by men of great wealth or political influence.

Order reversed and a new trial granted.