NATIONAL POLE & TREATING COMPANY v. H. S. GILKEY AND OTHERS.[1]

December 12, 1930.

No. 27,971.

[1]Reported in 233 N. W. 810.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for appellant.

*James E. O'Brien,* for respondents.

WILSON, C. J.

Plaintiff appealed from an order denying its motion for a new trial.

Because the controlling question is whether the evidence is manifestly contrary to the conclusion a rather extended statement of the facts seems necessary.

On July 7, 1926, a contract in the nature of a lease was made in the name of H. S. Gilkey with the Great Northern Railway Company. It related to a plant to be constructed at Hillyard, Washington, for treating ties, poles, posts, and timber products to delay natural decay. Plaintiff claims that Gilkey, in acquiring the contract, was acting for the Northern Tie & Treating Company, plaintiff's predecessor in interest, and for plaintiff, and that Gilkey wrongfully appropriated the contract to his own use and the use of Pendleton & Gilkey, resulting in a constructive trust in which plaintiff and other corporations merged therein were the cestui que trusts. Gilkey denies the claim, and the court found against the plaintiff.

### ADMITTED AND UNDISPUTED FACTS.

Since about 1892 Gilkey and one Pendleton (brothers-in-law) were partners as Pendleton & Gilkey. They started in business in Wisconsin. Twenty-six years ago Gilkey moved to Minneapolis, where he has since lived. For many years Pendleton has lived at Everett, Washington. Their business was primarily buying and selling posts. They acquired two sawmills. They acquired and dealt in timber lands. They never engaged in the business of treating timber products except through the Northern Tie & Treating Company, hereinafter mentioned, until after the making of the contract in question. The record does not show that they even controlled any corporations except Pendleton & Gilkey Company and Washington Wood Preserving Company.

The National Pole Company was owned by one Kirkpatrick, living in Michigan, who died in 1922. This company made and sold cedar poles. It also operated plants for treating timber products. It owned such a plant at Everett, Washington, and was interested in two such plants at Yardley and Sand Point, Washington. Mr. Kirkpatrick, through this company, was engaged in such business for many years. He was a close personal friend of Gilkey. They had extended business relations. Mr. Bole, a nephew of Mrs. Kirkpatrick, was president of the National Pole Company after the death of Mr. Kirkpatrick, and Mr. Bole died before the trial of this case.

Mr. E. W. Backus has lived in Minneapolis for many years and apparently has extensive interests. Among his corporations the record shows: The Minnesota & Ontario Paper Company, Backus-Brooks Company, International Lumber Company, the Great Lakes Paper Company, St. Francis Pulp & Paper Company, the Kenora Paper Company, and the Minnesota, Dakota & Western Railway Company. Mr. Backus was a director in each of his companies, and except as herein otherwise indicated he owned a controlling interest in each.

In 1913 the American Cedar Company was organized. The International Lumber Company (Mr. Backus) owned one-third of the stock. Pendleton & Gilkey owned one-third thereof, and Mr. Kirkpatrick the other one-third thereof.

In about 1920 Mr. Gilkey, connected with and as an official of the Walsh Tie Company, purchased a site at New Brighton, Minnesota, practically adjacent to Minneapolis, upon which a pressure treating plant was established. It operated about two years before it began treating for the Great Northern Railway Company. Its primary or original work was treating ties owned by the International Lumber Company, which it after treating sold to various railroad companies. After Mr. Walsh's retirement, Mr. Gilkey became president of this company.

In 1923 the Northern Tie & Treating Company was organized and acquired the business of the Walsh Tie Company, including the

New Brighton plant. Its business was to treat ties, posts, poles, and timber products. It operated until 1926, when its business was taken over by plaintiff. The Northern Tie & Treating Company had $300,000 par value outstanding preferred stock. One-half of this stock was owned by the International Lumber Company and the other half by the American Cedar .Company. It had 27,000 shares of common stock, of which 21,000 shares were owned equally by the same two companies. Mr. Gilkey was the president of the Northern Tie & Treating Company, secretary-treasurer of the American Cedar Company and a director in both companies, and the active executive officer of each. Mr. Gilkey's son-in-law, one Moore, was the superintendent of the New Brighton plant. The Northern Tie & Treating Company had a contract with the National Pole Company to treat and yard all its poles going through the Twin City gateway or Minnesota Transfer. In 1925 and in 1926 it had valuable contracts with the Great Northern, the Soo, and other railroads for treating timber products.

Mr. Gilkey became associated with Mr. Backus in 1913, and their business relations were close, friendly, confidential, and harmonious until in July, 1926. Mr. Gilkey became a director in practically all the Backus companies. He was consulted on practically everything of importance that came up in relation to all of these companies. He made trips for them with Mr. Backus and without Mr. Backus. He devoted about one-third of his time to the interests of Pendleton & Gilkey, one-third to the Northern Tie & Treating Company, and one-third to the other Backus interests. He was ill from May to the middle of July, 1925. He was confined to his home about two months immediately following December 25, 1925, on which day, while his chauffeur was driving his car, he suffered injuries in an automobile accident. Shortly before the automobile accident, the subject of a merger, which subsequently resulted in the incorporation of plaintiff, was first seriously discussed by Backus and Gilkey. The matter of acquiring the business of the National Pole Company had been under consideration by Backus and Gilkey for some time. While Mr. Gilkey was incapacitated Mr. Backus

negotiated with Mr. Bole. When Mr. Gilkey returned to his office he participated in the further negotiations. Plaintiff in anticipation of a so-called merger was incorporated in July, 1926. The purpose was to acquire the National Pole Company, the American Cedar Company, the Northern Tie & Treating Company, and some of the assets of Pendleton & Gilkey.

In May, 1926, in contemplation of this merger, Mr. Gilkey went to the state of Washington principally to look at assets of the National Pole Company. He took with him Mr. Moore, the superintendent of the plant of the Northern Tie & Treating Company at New Brighton. He wanted Mr. Moore to see the treating plants owned in the west by the National Pole Company. Mr. Gilkey was the one who called Mr. Backus' attention to the opportunity of acquiring the National Pole Company, which, because of the friendship between Gilkey and Kirkpatrick, wished Mr. Gilkey to have the first opportunity of acquiring the business. Mr. Gilkey then said to Mr. Backus: "If we ever want to purchase the National Pole Company, now is the time to do it." Mr. Backus told Mr. Gilkey that if the matter came to a deal on the National Pole Company Pendleton & Gilkey could have every reasonable interest that they wanted. Gilkey said they were not in a position to put up any money, and Backus told them that that might be true but that he would carry them for a part of it and said: "We will work out a deal that is satisfactory." Gilkey told him that he did not know just how Mr. Pendleton would feel about it, and Mr. Backus said to him: "Well, we will work it out some way; if we can't work it out on a preferred stock basis or by our carrying part of the interest, why I will see you get a substantial interest in the common stock because I expect you to look after this company and be responsible for it; you know I haven't got time to do it or time to bother with it"; and he said to Gilkey: "I am doing this largely on your account, anyway." Mr. Gilkey also testified that Mr. Backus offered to finance Pendleton & Gilkey on any part of the contract purchasing the National Pole Company in relation to the merger. Mr. Gilkey also testified that Mr. Backus in this con-

nection said to him: "You [Pendleton & Gilkey] can have any part of this National Pole Company if you want it, and give your notes for it." Mr. Backus had previously loaned them money. On one occasion he loaned them $40,000; on another occasion $60,000.

The National Pole Company had contracts with the Western Electric Company and the Graybar Electric Company, but they were in danger of being lost. Backus and Gilkey knew this. In June, 1926, they went to New York to see Bole about closing the purchase of the National Pole Company and also to see the representatives of the Western Electric Company and the Graybar Electric Company to ascertain whether their business could be held if the purchase was made. Otherwise the purchase would not be made. This trip was satisfactory, and Mr. Backus committed himself to the amount of $50,000 and made a contract to purchase certain assets of the National Pole Company for $850,000 and the Kirkpatrick interest in the American Cedar Company for $50,000. This contract was taken in the name of Mr. Backus for the purpose understood by the parties, including Mr. Gilkey. The parties were advised that it was better that this contract and the one now under consideration be taken in an individual name in relation to taxes. The assets were later turned in to plaintiff. These parties were in conference at the Vanderbilt Hotel in New York City on June 14, 1926—at least the Kenney telegram bears that date.

When the American Cedar Company was organized Mr. Kirkpatrick was dealing in poles, Pendleton & Gilkey were dealing in cedar posts, and Mr. Backus was dealing in pulpwood. In the business of this corporation it was understood that it would turn to each of these three interests the respective materials in which they were interested. This plan was carried out satisfactorily to all. Each was helpful to the other two.

In negotiating the merger Pendleton & Gilkey and Mr. Backus contemplated putting in certain assets as hereinbefore mentioned. Pendleton & Gilkey offered to put in two tracts of timber land, one in British Columbia and one in Oregon. For one of these tracts they asked $800,000. Mr. Backus thought it worth $350,000 only.

This and other differences arising out of the negotiations resulted in an unfriendly disagreement and, except as to their interests in the Northern Tie & Treating Company and the American Cedar Company, Pendleton & Gilkey put nothing in plaintiff corporation representing the so-called merger. Pendleton & Gilkey owned only an undivided one-half of these lands. They proposed putting them all in, and they were to settle with a Mr. Bratnober, who owned the other half thereof. Mr. Backus put a value upon the stock of the Northern Tie & Treating Company that was not satisfactory to the other interested stockholders, but negotiations resulted in his yielding to the extent of about $500,000. The stock in the Northern Tie & Treating Company was finally put in at about $50 per share or $1,350,000, though its tangible assets were less than $700,000. The difference was for good will and business prospects. The merger was completed about September 22, 1926, when the plaintiff corporation became a reality. Mr. Gilkey became a director thereof and the chairman of its board of directors. He was its executive officer directing the affairs of its business. This continued up to January 19, 1928, when he and Mr. Pendleton were removed from the board by the stockholders. This was because of their assertion of ownership of the contract in question as against the plaintiff, which claims to have first learned of such hostile assertion in December, 1927. There was no evidence to the contrary. Up to about that time the offices of plaintiff, like those of the Northern Tie & Treating Company, were located in the McKnight building, Minneapolis, next door to the office of Pendleton & Gilkey, for the convenience of Mr. Gilkey. Thereafter they were moved into the offices of the Backus companies.

In the negotiations for the merger and in discussing values of property that was to be put therein, neither side mentioned the contract now in question, though Gilkey claims that he believed that this contract would be one of the assets of Pendleton & Gilkey going into the merger.

In the fall of 1926 plaintiff negotiated a $2,000,000 gold note loan, and in making a statement of its assets to its broker it did not list

the contract in question, while certain contracts for treating at the New Brighton plant were mentioned. The plant had not then been constructed.

So much for the background and situation of these parties wherein the contract in question had its inception; but, continuing the admitted and undisputed facts:

### THE HILLYARD CONTRACT OF JULY 7, 1926.

In August, 1925, Mr. Gilkey talked with persons connected with the Great Northern Railway Company relative to establishing a treating plant in the west. He talked to Mr. Backus about the possible project and told him that he, Mr. Gilkey, had had Mr. Moore talk to the Great Northern and that Moore reported back that the Great Northern already had a site in Hillyard near Spokane, with the idea that they might some time put a treating plant in that location; and that Mr. Moore reported that the Great Northern, because of commercial business, might be interested in leasing the ground to someone who would build a plant on it. Mr. Backus then told Gilkey that the matter was worth following up. Mr. Gilkey did. He and Mr. Backus talked of it at different times but with no definite results. The site at Hillyard which was used consists of about 80 acres of land, which is now perhaps in the city limits of Spokane and near the Great Northern shops. Gilkey talked with a man named Kerr, who was an assistant to one of the vice presidents of the railroad company. In October, 1925, Gilkey submitted a proposed contract to Mr. Kerr, with no results. Mr. Moore was with Mr. Gilkey at the time he submitted the proposed contract. Mr. Moore, the superintendent of the plant of the Northern Tie & Treating Company, who had no interest in Pendleton & Gilkey, made about four trips with Mr. Gilkey to see Mr. Kerr, aside from seeing Mr. Kerr twice while Mr. Gilkey was incapacitated. Mr. Moore also saw Mr. Davis of the railway company several times while Mr. Gilkey was confined to his home. Mr. Moore was also present when Gilkey talked to Mr. Kenney, a vice president of the railway company, about June 10 or 12, 1926.

Late in February, 1926, Mr. Gilkey talked to Mr. Davis, the chief engineer of the railway company. Mr. Gilkey submitted a contract to Mr. Davis and discussed the subject. Mr. Gilkey saw the Hillyard site in May, 1926. Mr. Moore was with him. Mr. Gilkey, upon returning to Minnesota, talked to Mr. Backus about the proposed contract, and just before making the trip to New York the latter suggested the advisability of him, Mr. Gilkey, going to see Mr. Kenney, the vice president of the Great Northern. Mr. Gilkey testified:

"He [Mr. Backus] said if I wanted him to he would telephone over to Mr. Kenney and I could probably see him right away. It was Saturday and a short day, and this was in the morning; and I told him yes, he knew Mr. Kenney a good deal better than I did."

Backus phoned Kenney. Gilkey went. Kenney saw him. In relation to his talk to Mr. Kenney, Gilkey testified relative to what he said to Mr. Kenney:

"If you get it [the contract] worked out all right I would like to have you send me a wire to New York in care of the Vanderbilt Hotel; I will be there; I would like to know what decision you come to. * * * I told him that we had been figuring for some little time on the purchase of the National Pole Company and that we were going down to New York that night to thresh out some matters with the Western Electric Company and the Graybar Electric Company, and that Mr. Bole, the president of the National Pole Company, we also expected to meet him in New York and thought we would be able to close the matter up; and that if we succeeded in the purchase of the National Pole Company that it was our intention of forming one company which would consist of the National Pole Company, the Northern Tie & Treating Company, the American Cedar Company, the cedar interests of the International Lumber Company, and a part of the assets of Pendleton & Gilkey."

While Mr. Gilkey and Mr. Backus were in conference with two men at the Vanderbilt Hotel in New York City on June 12, 1926, Gilkey received and showed to Mr. Backus a wire from Mr. Kenney

advising that the contract was approved and would be executed.

On the way to New York Mr. Gilkey talked to Mr. Backus about his talk with Mr. Kenney, and upon receiving the telegram from Mr. Kenney Mr. Gilkey wired Mr. Kenney his thanks. The contract in question was executed.

The Washington Wood Preserving Company was incorporated in August, 1926, and all its capital stock is owned by Pendleton & Gilkey. With the consent of the railway company Gilkey assigned the contract in question to this corporation, which assumed and has since been performing the contract.

In the early part of the negotiations with the Great Northern Mr. Gilkey testified that there was no other thought except that "we" would have to build the plant ourselves. That is, he did not then expect the railway company to build the plant. The first contract that Gilkey submitted to the railway company required the lessee to build the plant. It was not made in Gilkey's name but was in blank. It was then thought that the construction of the plant would cost about $400,000. The second contract submitted to the railway company required the railway company to build the plant. Gilkey submitted the second contract to Mr. Backus for suggestions, and he made some penciled notes upon it. During the negotiations for the contract, which extended over several weeks, Mr. Gilkey on one occasion was uneasy about the attitude of one Bushnell in the purchasing department of the railway company toward the project, and he took that up with Mr. Backus and suggested that his son, because of his acquaintance and friendship, might be helpful with Mr. Bushnell.

At the conference with Mr. Kenney on June 12 Mr. Gilkey told Mr. Kenney that he was going to New York with Mr. Backus that night and that it was essential that he get a reply in New York because the arrangement of this contract or the consummation of this contract would have a great deal to do with the final decision of some merger with the National Pole and various other companies.

The subject of the contract was discussed between Mr. Gilkey and Mr. Backus on numerous occasions. The contract made in the name

of Mr. Backus with the National Pole Company contains a provision for the formation of a corporation to be known as the National Pole & Treating Company or some other similar name to which the seller therein agreed that Mr. Backus might assign the contract.

Paragraph 32 of the contract in question made in the name of Mr. Gilkey with the Great Northern Railway Company reads:

"The Contractor is engaged in the business of treating poles, piling and timber for persons and corporations other than the Railroad Company. If the facilities are available at the plant, which shall be constructed under the terms of this agreement, for treatment of such materials for such commercial purposes, then the Contractor shall use the plant constructed under this agreement for such commercial treatment of such materials in preference to any other plant owned or operated by the Contractor; provided, however, that if the total of the inbound and outbound freight rates to any plant owned or operated by the Contractor, other than the one constructed hereunder, shall be less than the total of the inbound and outbound freight rates to the plant to be constructed hereunder, then the provisions of this paragraph shall not be binding upon the Contractor and he shall be free to use any plant owned or operated by him as he may desire for such commercial treatment of materials."

In 1927, after the contract had been executed, a Mr. Costello, who represented the Great Northern Railway Company at Hillyard, asked Mr. Gilkey what connection the Washington Wood Preserving Company and the National Pole & Treating Company had with each other, and Gilkey testified:

"I told him that my personal connection with the company was that I was president of the Washington Wood Preserving Company and I was chairman of the board of the National Pole & Treating Company. I told him that the stockholders, the people that owned the Washington Wood Preserving Company, owned stock in the National Pole & Treating Company."

Thus far we have stated the admitted and undisputed facts as they appear from the record. The only important disputed fact or the important

### FACT HERE IN ISSUE

is whether the contract was taken in Gilkey's name for the benefit of the interests which he represented. We will now endeavor to point out the testimony wherein the conflict lies.

Mr. Backus testified that Mr. Gilkey asked him in whose name the contract should be made, whether in the name of Mr. Backus or of Seymour W. Backus or of Mr. Gilkey, and that he, Mr. Backus, told Mr. Gilkey to have the contract made in his own (Mr. Gilkey's) name for the greatest convenience. Mr. Backus says it was also agreed that he, himself, would take the contract with the National Pole Company in his name for convenience and that both the contract in question and the National Pole Company contract were to be turned over to the Northern Tie & Treating Company or to such corporation as the parties might organize, into which the proposed merger might be perfected. Mr. Backus did take the National Pole Company contract in his name and turned those assets into the merger. He testified that about two days before the contract in question was signed on July 7, 1926, Mr. Gilkey brought it to him and reported that he thought he had everything worked out and asked Mr. Backus to take the contract, read it, and make suggestions. He says that he did and that he discussed it with Gilkey and finally approved it. It was in Mr. Gilkey's name. Mr. Backus says that he had seen the previous draft which was in blank.

Mr. William P. Kenney, a vice president of the Great Northern Railway Company, testified that Mr. Gilkey talked with him on three occasions relative to the proposed contract; that he never looked with favor upon the proposed contract until Mr. Backus called him on the phone and he then felt that he had the Backus traffic back of the contract and that was what really gave him the favorable slant. Mr. Kenney also testified that he and Mr. Costello· understood that Mr. Gilkey was interested in the National Pole Company and would discontinue shipping to some extent from Yardley

and Sand Point on the Northern Pacific and would go over to Hill-yard. Such is the effect of paragraph 32 of the contract. Mr. Kenney testified that Mr. Gilkey told him that the Northern Tie & Treating Company were negotiating for the plant at Hillyard.

Mr. Martin J. Costello, western traffic manager for the Great Northern Railway Company, testified that he took up with Mr. Gilkey the question as to the "interests" (ownership) of the plant being constructed at Hillyard as to the relation between the Northern Tie & Treating Company and the National Pole Company, and that Mr. Gilkey told him that these interests were in substance the same; and later, when the subject was again discussed and he found out that the Washington Wood Preserving Company had been organized, he asked Mr. Gilkey if it was the same interests as the Northern Tie & Treating Company and the National Pole Company and that Mr. Gilkey said that it was.

Mr. Gilkey admits that Mr. Costello asked him the questions as indicated by Costello but disputes that he made the answers attributed to him by Mr. Costello and insists that he gave the answer hereinbefore quoted. He denies the assertions made by Mr. Kenney, and he denies the testimony of Mr. Backus to the extent that the contract was taken in his name for the benefit of the Northern Tie & Treating Company and the plaintiff. About the only question in dispute consists of the important issue as to whether or not Mr. Gilkey in the negotiation and taking of the contract in question in his name was acting for himself and Pendleton or was acting for the other parties as claimed by Mr. Backus.

## COMMENTS ON THE EVIDENCE.

Mr. Gilkey's denials and testimony have little, if any, support in the record. He is contradicted by Mr. Backus and also by the two disinterested witnesses, Costello and Kenney. He is contradicted by the admitted and undisputed facts. He is contradicted by many circumstances in the case. Permissible inferences tend to discredit Mr. Gilkey and support the contention of plaintiff.

Both parties seek to draw inferences from the conceded facts, and it seems necessary that we scrutinize the circumstances and

incidents with care to ascertain exactly what has been established by the proofs. While it is not our prerogative or duty to weigh the evidence in disputed matters, we must under legal rules, measure the proofs first to ascertain if there is any evidence to sustain a finding and, secondly, in such cases as this to determine whether the decision is manifestly against the preponderance of the evidence.

Gilkey's version of this transaction is highly improbable. It is contrary to ordinary human conduct. He had pride in the desired efficiency of his administration of the affairs of the Northern Tie & Treating Company. During all the time of the negotiations leading to the execution of this contract, Mr. Backus and Mr. Gilkey were close, loyal, and confidential friends and business associates. They had been for more than 12 years. Mr. Gilkey was on the boards of the Backus companies. He was directing the affairs of the Northern Tie & Treating Company in which he and his brother-in-law partner owned a one-third interest and his friend Kirkpatrick owned one-third, as did Mr. Backus. There was every reason for Mr. Gilkey to wish his company the greatest success. A merger was contemplated, and Mr. Gilkey was to direct the affairs of the same and his loyalty to the new company was to be expected. The merger included three treating plants already located in the vicinity of Hillyard. Would Mr. Gilkey undertake to become personally interested in a treating plant in a territory where the company of which he was chairman of the board and in active charge was interested in three such plants? A man would hardly voluntarily assume a position of such apparent conflict of interest. The businesses were competitive.

The plan of the American Cedar Company was to serve three interests in their respective fields—posts, poles, and pulpwood. Kirkpatrick's company, the National Pole Company, was taken over. The American Cedar Company was to be taken over. It would seem that this satisfactory plan would have been continued by the remaining associates at least until some agreement or understanding was had to the contrary.

Mr. Gilkey does not tell us how he and his partner could have raised the $400,000 when it was expected the contractor instead of

the railway company would build the plant. The record would indicate that they could not have done so, a circumstance indicating that they never thought of owning the contract until after the misunderstanding in July, 1926. They were unable to put money into the purchase of the National Pole Company. They were offered credit by their associate for this purpose. During the several months that Gilkey was negotiating for this contract and up to the time that he learned that the railway company would build the plant, instead of the lessee, he believed that the contractor would have to build the plant. In view of his own notion with respect to the financial condition of himself and partner, could he have entertained any idea at any time that he was acting for anyone other than the Northern Tie & Treating Company and its successor? Quite obviously not. As late as June, 1926, Mr. Gilkey told Mr. Backus that he and Pendleton could not raise money to put into the National Pole Company assets. The record does not show the financial ability of Pendleton & Gilkey to have made the deal. The evidence is quite convincing to the contrary. But for present purposes it is perhaps sufficient to say that Gilkey did not think or believe that they could. If he did not so believe, he must have carried on because he was acting for someone else. For whom?

If Mr. Gilkey contemplated this contract for Pendleton & Gilkey, why did he not make that fact known? Mr. Kenney testified that Mr. Gilkey told him the contract was for the Northern Tie & Treating Company. Gilkey denies this. But why was Mr. Gilkey crowding Mr. Kenney about June 10 or 12, 1926? Why ask for a wire to New York City? Gilkey offers no explanation. Having in mind the purpose of Mr. Gilkey and Mr. Backus in going to New York, it seems that they were interested in getting a wire only upon the theory that the contract was for the Northern Tie & Treating Company. Upon what other possible theory could Gilkey have told Kenney that it was very essential that he get a reply in New York because the arrangement of this contract would have a great deal to do with the question of the merger of the National Pole and other companies? We might say that he was anxious for the in-

formation because if he got the contract he would expect to drop out of his fiduciary position with the other companies; but when he got the contract he did not drop out, so we cannot assume that that was the purpose for wanting the information. Why Mr. Backus' intervention with Mr. Kenney if his version is wrong? Why the wire to New York City? Upon Mr. Gilkey's theory and subsequent conduct, there was no business connection between the getting of this contract and the consummation of the purchase of the National Pole Company. Upon Mr. Gilkey's theory it is hard to understand why he was telling Mr. Kenney, as he did on June 12, the details of the proposed merger, as he testified that he did. Why did he tell Mr. Kenney that it was very essential that he get a wire in New York because the arrangement for this contract would have a great deal to do with the question of merger of the National Pole Company and other companies? The failure of the record to answer this inquiry or explain the conduct therein mentioned goes far to minimize Mr. Gilkey's version. In the same degree it sustains the plaintiff's. Such conduct cannot be ruthlessly thrown aside as meaningless.

There is another circumstance which is deserving of careful attention and which may be susceptible of a construction reflecting upon the frankness and possibly the honesty of Mr. Gilkey. Concededly, Mr. Costello talked with him about the connection between the Washington Wood Preserving Company and the National Pole & Treating Company. Mr. Costello asked for this information. Mr. Costello says that Mr. Gilkey told him they were the same. Gilkey denies this. Gilkey says that he told him this:

"I told him that my personal connection with the company was that I was president of the Washington Wood Preserving Company and I was chairman of the board of the National Pole & Treating Company. I told him that the stockholders, the people that owned the Washington Wood Preserving Company, owned stock in the National Pole & Treating Company."

Now this limited statement is technically true. It may be that he made it. He says he did. Mr. Costello may have understood it

as meaning that they were the same. It is interesting to note in the record that when Mr. Gilkey gave this testimony in the trial of the case counsel for plaintiff was misled thereby. Folios 1330-1340. Costello may have been misled as counsel was. The incident shows what is apparent, that the answer has a very deceptive quality. It would seem strange that such an appropriate answer from the standpoint of Mr. Gilkey could have been mistakenly made. We must assume that he made it intentionally. He was president of the one corporation. He was chairman of the board of the other corporation. The stockholders in the Washington Wood Preserving Company, consisting of himself and his partner, did own stock in the National Pole & Treating Company, but who owned the balance of the stock in the National Pole & Treating Company? That was not told. Nor was it disclosed that Mr. Backus, who controlled the plaintiff corporation, did not own any stock in the Washington Wood Preserving Company. That was really what Costello had in mind. The answer as made did not answer the inquiry. It was thought by Costello that it did. It is difficult to see how this answer was made as an honest answer. It would seem to be a deceitful and artful one. Costello did not get the information sought. He was entitled to it. The subsequent conduct of Mr. Gilkey in making the claim here in issue would indicate that Gilkey did not wish to disclose the full truth to Mr. Costello. This answer was made after the misunderstanding in July, 1926. It was made after Pendleton & Gilkey had concluded to appropriate this contract to their own use, if it was not their intention in its original inception. It is a permissible inference that Mr. Gilkey well knew that the railway company believed the Backus interests were the Hillyard interests, and he was not hasty to disclose his claim to the contrary. If his position was an honest one from the beginning, it is strange indeed why he would make this most peculiar answer wherein he artfully evaded giving the information which he possessed and Mr. Costello sought. Such admitted conduct, like the admitted and undisputed facts, corroborates the Backus version of the matter in dispute.

The record provokes many inquiries that must be embarrassing to Mr. Gilkey. Why was he continually discussing the proposed contract with Mr. Backus? Is it not unusual for a man intrusted with the managerial duties and control of the affairs of the business of such a company as plaintiff to undertake to go into a competitive business? Was he to take the best business for his own company and the doubtful business for his employer? Such a situation gives rise to the agent's conflict of interest—a situation seldom justifiable and less frequently assumed by business men. If such was his plan and he remained unashamed, it would seem that he would have openly declared his purpose and put his position beyond possible misunderstanding when he saw the National Pole Company with its treating plants in Washington put into the hands of his confidential associates who were leaving the responsibility of its management practically exclusively in his hands. He accepted the most important position with plaintiff where none of its affairs was unknown to him, and at the same time, according to his own version, he proceeded to develop the Hillyard project as his own.

Note the foregoing and then ask the question as to whether Mr. Gilkey at the time he made the contract in question was engaged in the treating of poles, piling, and timber. If so, it was only by virtue of his connection with the Northern Tie & Treating Company and the proposed merger. Otherwise he was not interested in the treating business. But what about the provisions of paragraph 32 in the contract in question? It recites that Gilkey was then engaged in the business of "treating poles, piling and timber" and that he was doing so for persons and corporations other than the Great Northern Railway Company. Obviously whoever drafted this contract, whether Gilkey or the railway company is not important, had a very definite purpose in mind, and this paragraph was not an inadvertence. The contract was carefully and deliberately planned. More than one draft of it was submitted. In the contract as executed Mr. Gilkey puts himself upon record as being engaged in the treating business and contracts that he will use the Hillyard plant "in preference to any other plant owned or oper-

ated by" him. Does he wish to be understood as thus solemnly and openly putting himself on record that he will use his individual plant in preference to the plants owned by plaintiff and in which he was interested as a stockholder and of which he was a director and the chairman of its board of directors and the officer in whom it affairs were intrusted? He has so contracted. He has thus undertaken to do the very thing that the law jealously hopes to prevent. He began to yield to the conflict of interest at the very commencement of plaintiff's business. He was assuming an antagonistic and inconsistent position of such character and importance as to point to the conclusion that he must be mistaken in his claim that he ever thought of his contract being his own until after the misunderstanding in July, 1926. Possibly with the intense feeling thereafter existing he may have felt justified to do as he did do; yet we must keep in mind the fact that this contract in question was executed before the misunderstanding took place. This is the contract knowledge of the making of which Gilkey said was essential to the doing of the business in New York in June, 1926, upon which the merger was conditioned.

Mr. Gilkey testified that he sought the advice of Mr. Backus as to the Hillyard contract, but he relates another unusual incident in relation to that. He says that he left the contract with Mr. Backus over night and the next morning went in to Mr. Backus' office in his absence and took the contract from Mr. Backus' desk, with the penciled marginal notations which he says were of no great importance, and walked away with it without then or later discussing the contract or notations with Mr. Backus. It is possible that he did that. It is a strange procedure however in the face of the numerous talks about the project and the further fact that he took the contract to Mr. Backus for a purpose. Mr. Pendleton in a minor detail supports Mr. Gilkey by denying that he was present with Mr. Gilkey at a time when Mr. Backus says he discussed the contract with Gilkey in the presence of Pendleton. The numerous conversations had with Mr. Backus would tend to indicate that he was an interested party. Mr. Backus is apparently a

successful business man. Having the opportunity to make suggestions as to the contract, having it in his possession and having read it as all interested parties agree, it is not believable that he would have permitted this contract ever to have been made, to say nothing about phoning Mr. Kenney urging him to make it, when we read paragraph 32 thereof and note that Mr. Gilkey is making the Hillyard plant a preferential plant for treating business over any other plants in which Mr. Gilkey is interested and which includes all the plants in which Mr. Backus is interested. The Great Northern contract relating to work at the New Brighton plant, made by the Northern Tie & Treating Company and after which it is said the contract in question was patterned, contains no such provision as paragraph 32.

Mr. Moore's time belonged exclusively to the Northern Tie & Treating Company. He devoted a great deal of time to the negotiations of this contract. Respondents' counsel meets this with the suggestion that that was due to Mr. Gilkey's illness and his accident. But Mr. Moore's acts during Mr. Gilkey's confinement on these two occasions were comparatively few. He was otherwise active in a way that could be justified only upon the theory that the contract was for the Northern Tie & Treating Company. He made numerous trips to see and confer with Mr. Davis, the chief engineer of the railway company, when Mr. Gilkey was not confined to his home.

If Mr. Gilkey's activity was in the interest of Pendleton & Gilkey, there was no reason why the contract should not have been in their name. Gilkey does not claim to have told the railway company that the contract was for Pendleton & Gilkey. We must keep in mind that Mr. Gilkey made no claim of ownership until after the misunderstanding in July, 1926. In an attempt to answer why the contract was not in the name of Pendleton & Gilkey, he said the reason was because it was customary for him to take the partnership contracts in his name. But he could not name a single instance wherein he had ever taken a partnership contract in his individual name. His answer seems to have been a pretext.

The fact that none of the parties in perfecting the merger have mentioned this contract is more to their credit than otherwise. There was no established business. The plant was not then built. The future at Hillyard was necessarily a matter of opinion and conjecture as to what the outcome of the venture would be. For the same reason the plaintiff did not list it as an asset in the statement upon which it sought to negotiate a $2,000,000 loan. The contract then had no tangible value. The failure of anyone to urge a value of the contract at that time is without probative value. In answering the question as to why this contract had not been mentioned in connection with the proposed loan, Mr. Backus answered:

"Why, the best reason in the world. The plant wasn't built, it wasn't operating. We didn't know whether it was going to make money or lose money, and we wouldn't be talking about something we had no knowledge of."

There was of course no way at that time to determine whether the plant would ever be erected. Perhaps we should say presumptively it would. At least it was quite probable that it would be. Possibly it would not. No one could then indicate whether the plant if erected and put in operation would prove a financial success to the operator, or otherwise. It had no business history, and it had no established business. Had the railway company concluded to breach the contract and pay the damage resulting therefrom, the contractor would have experienced great difficulty in establishing any damage. But the contracts which had been made by the Northern Tie & Treating Company and which were at the time of the merger in existence and related to definite work to be done for the Great Northern Railway Company and other railroads were substantially renewal contracts and were contracts made by and with a going concern, and the outcome therefrom was of sufficient certainty so that the stockholders of the Northern Tie & Treating Company successfully claimed an element of value in fixing the value of their stock to be turned into the merger.

The claim that Gilkey served without pay is fallacious. He profited by a favored price to his copartnership on timber products.

Part of the time he drew $5,000 per year. In August, 1926, he and Pendleton were given $50,000 for Gilkey's services, and Backus-Brooks Company then also gave them $10,000 for Gilkey's services rendered that company. If he served some of the Backus corporations without pay, he was willing to do so and it was made up by others. He was in no way overreached.

It is also important to bear in mind that the record fails to show that Gilkey even sought Backus' advice whatever to Gilkey's personal or partnership matters wherein Backus was not financially interested.

The evidence does not show that Backus, prior to December, 1927, knew that Pendleton & Gilkey were expending their money carrying out the contract in question.

Upon plaintiff's version of the matter in controversy there were reasons for the contract to be taken in someone's individual name. It was not definitely known then whether the contract would go to the Northern Tie & Treating Company or to a corporation to be formed in the completion of the merger. Gilkey was quite naturally chosen as the trusted person. There is also evidence in the case that the parties were advised that the procedure was desirable in relation to taxes. Plaintiff's theory finds reasonable support in the record. Mr. Gilkey's does not.

Mr. Gilkey is flatly contradicted on the one salient feature in issue by Mr. Backus and also by Mr. Kenney and Mr. Costello, two disinterested witnesses. It seems that Mr. Gilkey must be mistaken in his suggestion that he participated in the merger plans in such great detail and at the same time carried on these negotiations for this contract, which he expected to put into the merger to his personal advantage over the Northern Tie & Treating Company or which he expected to operate independently of the Northern Tie & Treating Company and this plaintiff, all to his own financial advantage. Such a situation seems entirely to ignore his duty toward those whose affairs were intrusted to him. He was guiding the management, business affairs, and was the authorized, trusted representative of the plaintiff herein and of the Northern Tie &

Treating Company up to the time when the plaintiff came into existence. If we wholly disregarded the testimony of Mr. Backus relative to the controversial matters, we would still have to conclude that business men generally do not deliberately place themselves in such an inconsistent and antagonistic position as Mr. Gilkey has herein voluntarily assumed. The evidence utterly fails to indicate any disposition on the part of Mr. Gilkey so to act until after he was irritated and incensed by the misunderstanding in July, 1926. The evidence is quite convincing that the influence of the Northern Tie & Treating Company through Mr. Backus made it possible for Mr. Gilkey to get the contract and that the railway company thought and intended that their contract was for the Northern Tie & Treating Company. The controlling issue is whether Mr. Gilkey was acting for the Northern Tie & Treating Company, as claimed by Mr. Backus.

The admitted and undisputed facts indicate that Mr. Gilkey negotiated and acquired the contract for the Northern Tie & Treating Company and the plaintiff.

The evidence as a whole is very persuasive that he so acted. Substantially every circumstance throughout the case supports this theory. It is true that we have the denials of Mr. Gilkey as to certain statements and particularly as to the contract's being so taken in his name, but this denial can have little weight in the face of the great preponderance of the evidence in the case to the contrary.

The claim that is advanced in respondents' brief that Mr. Backus put the assets bought from the National Pole Company into the merger for more than he paid for them is not supported by the evidence in the case. It is purely a collateral matter. It may relate to the credibility of Mr. Backus as a witness, but he offers an apparently reasonable explanation involving the conduct of Mr. Gilkey and Mr. Junell and they make no denial of his version. In fact, if there was any difference in this respect it applied to the property of all the parties and all acquiesced therein. In any event, the matter is without substance in this case.

## Conclusion.

The facts are complicated and lengthy. Much evidence relates to collateral matters. The briefs make much of collateral and immaterial matters. It could hardly be expected that the busy trial court could go into the details of the matter with the deliberation that the matter has had here. We have studied the record with great care and have reached the conclusion that the finding on the main issue in the case is manifestly against the great preponderance of the evidence and that the trial court abused its discretion in not granting plaintiff's motion for amended findings or a new trial.

When the evidence taken as a whole is manifestly contrary to the finding, it is an abuse of discretion not to grant a new trial even if there be some evidence tending to sustain the finding. Ohlson v. Manderfeld, 28 Minn. 390, 10 N. W. 418; Voge v. Penney, 74 Minn. 525, 77 N. W. 422; Martin v. Courtney, 75 Minn. 255, 77 N. W. 813; Messenger v. St. Paul City Ry. Co. 77 Minn. 34, 79 N. W. 583; Peterson v. C. G. W. Ry. Co. 106 Minn. 245, 118 N. W. 1016; Evenson v. Aamodt, 153 Minn. 14, 189 N. W. 584; Bartroot v. St. Paul City Ry. Co. 125 Minn. 308, 146 N. W. 1107; Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 215 N. W. 678; Minneapolis Elec. Lamp Co. v. Federal Holding Co. 175 Minn. 421, 221 N. W. 645. Mr. Justice Mitchell in Voge v. Penney, 74 Minn. 525, 529, 77 N. W. 422, 423, said:

"But the testimony of the appellant is so inherently improbable, so strongly impeached by the documentary evidence in the case, so inconsistent with the pecuniary condition and general business habits of the deceased and with the subsequent conduct of the parties, that we have no hesitation in saying that the verdict was against the great preponderance of the evidence, and that the vast weight of the documentary and other circumstantial evidence tended to show that the facts were in accordance with the contention of the estate."

In Martin v. Courtney, 75 Minn. 255, 262, 77 N. W. 813, 815, Mr. Justice Mitchell also mentioned the testimony of a particular witness as tending to support the verdict, but added:

"Yet it [the verdict] is so manifestly against the great preponderance of the evidence that it was an abuse of discretion not to grant a new trial."

In Messenger v. St. Paul City Ry. Co. 77 Minn. 34, 79 N. W. 583, the court rejected the testimony of a plaintiff on the essential and vital point in the case as so inherently improbable and unreasonable that the trial court abused its discretion in not granting a new trial.

The rule is definitely established. It should be used cautiously and only in extreme cases, but when the cases come we must act. The great mass of circumstances in this case which tends to refute and make improbable the version of the defense and the character of the claim is so extraordinary that it should have most careful consideration and makes it advisable to have another trial wherein, with the help of the past, justice may be rendered with more certainty.

We need not discuss the law involved in other features of the controversy. It is sufficient now to say that if Gilkey was acting for the Northern Tie & Treating Company and plaintiff in acquiring this contract and he failed in his fidelity to them or either of them with whom he stood in a fiduciary relation, he could not become interested in the subject matter antagonistic to those for whom he was acting and with whom he was so closely associated. If he did so he should be held to an accounting. City of Minneapolis v. Canterbury, 122 Minn. 301, 142 N. W. 812, 48 L.R.A.(N.S.) 842, Ann. Cas. 1914D, 804. The complaint does not use the word "fraud," but it pleads facts and the evidence tends to prove facts which if true constitute fraud which may support a constructive trust. The doctrine of constructive trusts applies to an abuse of fiduciary relation. An agent owes his principal the utmost loyalty.

Reversed.

OLSEN, J. (concurring).

I concur in the result.

HOLT, J. (dissenting).

I dissent. A reading of the record is convincing to my mind that under the long established practice of this court the findings of fact

should be sustained since they are amply supported by the evidence.

Mr. Gilkey secured the approval of the Great Northern Railway to the proposed contract in the middle of June, 1926, when he and Mr. Backus were in New York negotiating for the purchase of the National Pole Company. The telegram conveying the information was shown Mr. Backus there. The contract was executed and delivered July 7, 1926. About that time and continuing thereafter until in September, the controversies between Mr. Backus and the minority stockholders in the Northern Tie & Treating Company as to the terms upon which that company should be merged in the plaintiff company were continued. Mr. Junell's testimony carries conviction, is clear, and uncontradicted that during those entire negotiations, when the values of the Northern Tie & Treating Company's properties and good will were discussed, including the contracts it had with the Great Northern Railway and the Soo Railway for treating at its New Brighton plant, there was no suggestion by Mr. Backus or anyone else that the contract in controversy was the property of the Northern Tie & Treating Company. It is not conceivable that, in the long drawn out negotiations and discussions regarding the terms on which the Northern Tie & Treating Company should go into a merger with plaintiff, Mr. Backus could fail to assert that this ten-year contract was a part of the assets, were it true that Mr. Gilkey had acted as agent for the Northern Tie & Treating Company in procuring this contract for it.

During their long continued friendly business relations Mr. Backus and Mr. Gilkey assisted one another even though both were not financially interested in the venture. Mr. Gilkey served without pay and without having any pecuniary interest as director in many of the many corporations owned and controlled by Mr. Backus. Each was engaged in many business enterprises, either individually, in partnership, or corporations where the other had no pecuniary interest. Mr. Backus was the sole owner of the International Lumber Company. Neither drew any salary from the Northern Tie & Treating Company, and it was well understood that Mr. Gilkey devoted part of his time to other interests and to the partnership of Pendleton & Gilkey. Pendleton & Gilkey as a

copartnership owned and controlled corporations and did business in which Mr. Backus and his corporations had no share. What more natural than that such close business associates should be mutually helpful in individual enterprises even though there was no purpose that the same was for a common or joint ownership. Mr. Backus knew that Pendleton & Gilkey were financially unable to share in the purchase of the National Pole Company, yet Mr. Gilkey was the one who suggested the purchase to Mr. Backus and went to New York with the latter to aid in the negotiations. Mr. Backus in the fall of 1926 and during the first part of 1927 knew that Pendleton & Gilkey were expending money in carrying out the contract here involved. They expended over $75,000 for equipment and payroll. Neither Mr. Backus nor plaintiff contributed thereto. The contract seemed of no interest to Mr. Backus until the last part of 1927.

It is said Mr. Gilkey is flatly contradicted by Mr. Costello and Mr. Kenney, superintendents of the Great Northern Railway Company, upon important propositions; but the version of Mr. Gilkey sounds reasonable to me, and the trial court could well conclude that the persons named placed a wrong meaning upon the language used by Mr. Gilkey. And it may be said that Mr. Backus upon a vital point was flatly contradicted by both Mr. Pendleton and Mr. Gilkey. There is no need here to refer to the inferences the trial court could rightfully draw from the manner, the terms, and the price upon which Mr. Backus procured the National Pole Company's and Kirkpatrick's interests and merged the same in plaintiff. It is quite clear to me that he did not do so on the basis that he had procured them as agent for the Northern Tie & Treating Company and for its benefit; for if he had, the price paid would have been the price that the company would have been charged with. It was not so handled.

A legal obstacle also seems to be in the way of plaintiff. It claims through the Northern Tie & Treating Company. The latter company was not in the business of acquiring or obtaining leases of treating plants. Its board of directors had never authorized Mr.

Gilkey to act for it. Assume that Messrs. Backus and Gilkey together did obtain this contract, and assume that it proved to be an unprofitable or losing venture, could they jointly or separately force the corporation to take it off their hands?

I do not think any court would come to their rescue.

It is true, individuals now do business in the name of corporations without observing the usual formalities which the law requires to evidence corporate action. But the Northern Tie & Treating Company was not a one- or two-man corporation. There were quite a few stockholders; and it seems to me what Mr. Backus claims was to be accomplished by Mr. Gilkey required some corporate authority here not in evidence.

However, the evidence, in my opinion, fully justified the findings of fact which the trial court made, and the conclusion of law inevitably follows that plaintiff is entitled to no relief.

The order should be affirmed.

DIBELL and STONE, JJ. (dissenting).

We concur in the result reached by Mr. Justice Holt.

