MINNIE L. AND EMMA E. PATTERSON v. G. W. ROTH AND ANOTHER.[1]

February 5, 1937.

Nos. 31,142, 31,143.

*O. A. Lende* and *Wilson & Wilson,* for appellants.
*E. H. Nicholas* and *Putnam & Carlson,* for respondent.

[1]Reported in 271 N. W. 336.

LORING, JUSTICE.

In two cases tried together to the court without a jury the plaintiffs had separate findings in their favor, the plaintiff Minnie in the sum of $23,760.25 and requiring that the defendant G. W. Roth quitclaim to her an undivided one-half interest in certain lands in North Dakota and in Pine county; the plaintiff Emma in the sum of $6,301.06, with a like requirement in her favor in regard to the same lands. Each of the plaintiffs moved for amended findings or a new trial. Minnie asserted that defendant G. W. Roth owed her $45,010.07 with interest from May 26, 1936, at five per cent. Emma claimed $21,786.25. From the orders denying their motions they have appealed to this court. We do not, of course, review the orders denying the motions for amended findings but treat those motions as assignments of error on the motions for new trial.

The various questions presented by the appeal will be taken up and discussed in their order as raised by appellants.

The action brought by Minnie comprised two causes, the first being upon a promissory note for $30,000 signed by the defendant G. W. Roth and Sarah A. Roth; the second alleged an account stated for $7,206.59 as of December 31, 1932. The defendant G. W. Roth answered that the note was given under the mutually mistaken impression and belief by the parties that he was indebted in some amount and that he was not in fact indebted in any sum; further that it was agreed that if an accounting showed that he was not indebted or was indebted in a lesser amount he was not to be charged with more than his actual indebtedness. He also denied that an account had become stated, alleged mistake and error in the accounts and annual balances, and demanded an accounting, seeking credit for the reasonable value of his services.

The suit brought by Emma alleged an account stated in the sum of $20,016.24 as of December 21, 1933. This the defendant G. W. Roth denied. He made the same allegations in regard to the accounts and services as in Minnie's case and demanded an accounting.

The transactions out of which these cases arose extended over a period of some 39 years. In October, 1893, Andrew Patterson died

testate at Burlington, Wisconsin, leaving a widow and nine children, two of whom were Emma and Minnie, these plaintiffs. Sometime in the month of February, 1894, the property left to the nine children was divided and partitioned by mutual agreement. At that time some of the children were not competent to look after their own affairs, and this defendant Sarah A. Roth, who was then Sarah Patterson, agreed to take charge of the property of Minnie and Emma. Sarah was an experienced businesswoman, having been for eight years bookkeeper, cashier, and manager of a bank owned by her father and her brother George at Ashton, Iowa. Her agreement to look after this property was conditioned upon her obtaining the assistance of the defendant G. W. Roth, whom she expected to and did marry in May, 1894. Roth agreed to assist her, and accordingly the property of Minnie and Emma was turned over to Sarah to be looked after. There was no written agreement or other formality about the arrangement. Originally there were four pieces of land which had fallen to the portion of these two girls. One tract, known as the Harris farm, inventoried at $5,000, was sold for $6,096.50 prior to the 1894 harvest. The three remaining tracts were known as the Sibley, the Chandler, and the Little Rock farms, all inventoried at $7,980 and subject to a mortgage of $1,132.45 on the Chandler farm, leaving a net inventory value of $6,847.55. There were practically no buildings on these tracts, and much of the land was wild. In the period from 1895 to 1910 each of the two girls received from her father's estate $3,744.01, and later in 1919 or 1920, upon the death of their mother, they received from her estate an aggregate of $15,909.72, all of which was turned over to the Roths for investment.

The defendant G. W. Roth, at Sarah's request, proceeded to manage, cultivate, tile, and improve these farms. More farms were purchased. With the money received from the estates and obtained from the crops on the farms, he made improvements and repairs to the extent of approximately $51,000. He lent money for the plaintiffs on good security at high rates of interest. He paid off the mortgage on the Chandler farm. He paid to Minnie and Emma, in round figures, $94,000 in cash, and, except the Harris farm, they

still have all of the land they inherited or purchased except one quarter which was sold at a profit of something over $5,000. Roth's management is conceded to have been competent to an unusually high degree. Apparently everything was harmonious in the family until the depression, when, due to lack of revenue from their property and investments, the plaintiffs went to live with the defendants, who were then residing at Worthington in this state. Dissatisfaction arose, and these suits were the result.

It appears that Sarah kept all books in regard to the plaintiffs' affairs except certain field or grain books which Roth kept as he visited the various farms. She kept a joint account and also one for 'each of the plaintiffs, all in the same books in which she kept her husband's accounts. He was allowed to make no entries in the books which she kept. He would make his memoranda in the grain books and turn them over to Sarah, and she would make the entries in somewhat more elaborate grain books which she kept and in her journal and ledger. Data for other entries she got from checks and receipts. She drew checks on her husband's bank account. Sarah also kept small books which were turned over to the two sisters with a statement of the year's business, something as bank deposit books are kept by depositors. The two sisters would keep these books, send them to Sarah at the end of the year, and she would make appropriate entries in summary for the year and return the books to the girls. Sarah likewise after the federal income tax law had been enacted made out income tax reports for her sisters for Roth, as agent in charge of their property, to sign and return. Apparently she and her husband made joint returns for themselves which she prepared.

As a matter of convenience and with the knowledge and consent of all parties, loans were made in Roth's name, and all moneys were deposited in his account, Sarah making appropriate entries therefor. She was vigilant in protecting plaintiffs' interests; in their behalf made arrangements and contracts with her husband and approved deals he made for them. From the beginning, Sarah, on her books, charged her husband with interest on the plaintiffs' balances. He asserted, and the trial court found, that there was

no agreement to this effect and that such charges were erroneous and unjustified. These charges, if erroneous, being carried into the books from year to year, vitiated the subsequent balances. Roth claimed that he was not aware of them or of other erroneous charges against him but assumed that his wife kept the accounts according to the facts as he viewed them.

■ The plaintiffs' first contention is that the account books introduced in evidence so conclusively impeach and contradict Roth's testimony that, under the rule of Hicks v. Stone, 13 Minn. 398 (434); Krueger v. King Midas Mill. Co. 169 Minn. 153, 210 N. W. 871; National Pole & Treating Co. v. Gilkey, 182 Minn. 21, 233 N. W. 810, reasonable minds must adopt a conclusion contrary to the one arrived at by the trial court. From a careful examination of the entire record we do not so conclude. It is true that Sarah kept these accounts and also the accounts of her husband's transactions in the same set of books, and these books were in the house and accessible to her husband. But even if we consider them to be his books and, as such, chargeable to him as admissions, we do not think his evidence must be cast aside as unworthy of belief because he disputes various items in those books. His wife was an experienced bookkeeper and businesswoman. The bank in which she was bookkeeper and cashier appears to have been largely in her charge and under her management. Her father never took any part in its management; her brother was out of the bank a great deal, if not most of the time. She made loans and conducted a general banking business, relying on her own judgment. This gave her a good business training, and it is not surprising that, busy as Roth was, attending to as many as 22 farms, he should have implicitly trusted so experienced a woman, not only to enter the items properly but to keep them according to the facts and not to enter improper charges against him. Moreover, she was the principal in business with her sisters, and he was her assistant, in effect doing the field work. As far as the plaintiffs' accounts were concerned, she was the responsible and principal party, and as to those accounts the books were in effect her books. She was the one who dealt with her sisters and in their behalf dealt with her husband as her assist-

ant on the various questions which arose in connection with her stewardship. She made various bargains with her husband as to how he should conduct the business of looking after plaintiffs' farms and investments. Being his wife, he naturally might rely on fair treatment from her. Being competent and experienced, he might reasonably expect she needed no supervision or checking up on the accuracy of her methods. Upon the whole record, we think that his testimony justified the credence which the trial court gave it, and it impresses us as more reasonable and probable than the testimony of his wife, supported though that may be by the books which she kept. Her bias in favor of her sisters is quite evident, even from the cold record.

As far as the income tax returns signed by Roth were inconsistent with his testimony, they were to be considered as admissions but not conclusive.

■ Prior to 1911 the defendant invested surplus moneys belonging to the plaintiffs, at high rates of interest, in mortgages, notes, and other like securities as safe investments became available. The court took the view that the plaintiffs' money was lent out as fast as good investments could be found. That was the extent of Roth's responsibility. We think the trial court was correct in holding that Roth was not chargeable with interest on funds not invested during this period. He was, of course, chargeable with all income received by him for his principals but under the arrangement was not under any duty to remit as he collected this money. He might properly hold it for reinvestment. There is no claim that he did not invest it as fast as opportunity offered. Nevertheless Sarah charged her husband with interest on annual balances. He testified that there was no agreement that she might do so. This presented a question of fact.

After January 1, 1911, pursuant to an agreement made by Roth with his wife, representing the plaintiffs, he was allowed to use plaintiffs' surplus funds in his business at seven per cent through 1924 and six per cent thereafter until 1931 and at five per cent thereafter. There being no evidence as to the amounts which he actually used, the trial court charged him with simple interest at

those rates on the entire balances of the plaintiffs' funds in his hands.

■ The trial court found that the accounts never became stated as to either plaintiff. The plaintiffs claim that the books amounted to accounts stated; that the small books marked exhibits 11, 12, and 13, kept by the plaintiffs, in which annual entries were made by Sarah, amounted to such accounts and that as to Minnie the note sued upon was to that extent an account stated. We think the evidence supports the trial court. The books we have already discussed and have concluded that the trial court was justified in holding that erroneous entries were made in them without Roth's knowledge or assent. Exhibits 11, 12, and 13, sent to plaintiffs annually by Sarah, go down with the regular books of account upon which they are wholly based. The note is covered by Roth's testimony. Lack of assent on Roth's part was a justifiable holding. Mistake and error in the accounts were sufficiently alleged in the answer to justify inquiry into that feature of the case, and the court's findings in effect cover mistake in the account even if there were no finding that no account had become stated.

■ Emma Patterson owned individually a farm of 154 acres known as the Iona farm. Roth owned a contiguous 80 acres. For convenience, these two tracts of land were rented together to the same tenant, Emma receiving 154/234 of the returns from the place and Roth receiving the remainder. After 1925 Sarah divided the returns one-third to Roth and two-thirds to Emma. In 1915 the buildings on both places were partly destroyed by a tornado, and the remains of the buildings on Roth's place were taken over to Emma's place, where they went into the reconstruction of Emma's buildings. The court found that the value of this material so contributed by Roth was $500. Thereafter Sarah charged 80/234 of the new construction to Roth and gave him no credit for the buildings and materials furnished. The expense of tiling and eradicating quack grass from the Patterson farm was likewise charged 80/234 to Roth, as was the expense of insurance on the buildings, the digging of a well, and the maintenance of other farm buildings. Roth had no legal title to any share in these buildings nor any en-

forceable arrangement with Emma that he should ever realize anything out of his contribution. She claims it was a joint enterprise gone into with the expectation that the farm would sometime be sold and the price divided, as were the crops. The trial court refused to amend its findings so as to declare the arrangement to be a joint adventure. This was equivalent to finding that it was not such an adventure, and we think the finding wholly justified by the evidence. The ownership of the land was wholly separate, the title to the buildings was wholly in Emma, the evidence goes no further than to indicate that the two tracts were handled and rented as one for the convenience of the respective parties. The court did not allow the whole of Roth's contribution with interest but compromised the credit to him on that account at $3,100. Having found the facts that it did, the allowance to Roth would seem to be fair and reasonable and less than he would have been legally entitled to. It is sustained by the evidence.

■ In 1905 a man named Douglas borrowed $4,000 of the plaintiffs' funds, Fred Patterson, the plaintiffs' brother, going surety for the loan. This debt was subsequently reduced to approximately $2,100, and the security that had been taken for it proved of no value. Douglas owned some land in Kidder county, North Dakota, which he deeded to Roth as security for the balance due on this loan. Plaintiffs claim that this was an absolute deed to Roth and that he took the land in his own right and authorized Sarah to credit the plaintiffs with $3,100 and charge him with a like amount. Roth denies this arrangement and claims that he took the land only as security with the hope that he might realize the remainder of the loan out of it for the plaintiffs. He so testified and asserted that the first he knew that the $3,100 had been charged to him on account of this land was February, 1933, after this trouble with his sisters-in-law had started. The court found the facts in favor of Roth. He paid taxes on this North Dakota land in excess of the income and is rightfully entitled to credit therefor as given by the court.

■ In the course of their handling of the plaintiffs' affairs Roth made a $500 loan to Fred R. Patterson, a brother of the plaintiffs. He was unable to repay this sum, and he deeded certain land in

Pine county, Minnesota, as security for the loan. Roth paid delinquent and current taxes on this land from June 1, 1922, to June 1, 1931, amounting to $3,576.91, and received income therefrom amounting to $1,497.82. The trial court found that he was handling this land for the plaintiffs and should be given credit for the difference between the income and expenditures which he had made. His evidence justified such a finding.

On the question of Roth's compensation we quote from its memorandum the reasons which impelled the trial court to allow the moderate amounts which it allowed, as follows:

"The net inventory value of the lands received by plaintiffs in the settlement from the father's estate was $11,847.55. These lands consisted of 680 acres, practically unimproved. In the settlement of the father's estate each of the two plaintiffs received $3,744.01 in cash, which came into the hands of the Roths. In 1918 the mother of the plaintiffs died and from her estate each received $7,204.86. These amounts with an additional $1,500 which came to the account of plaintiff Minnie L. Patterson were received by the Roths in 1918 to 1920. Also contributed was $1,000 by Emma in 1894 and $431 and $225 at more recent dates.

"Plaintiffs now have the so-called Brewster farm, 320 acres, elaborately improved, Emma Patterson has the Iona farm of 154 acres, well improved, and plaintiffs have three of the original farms, two of them now well improved. In addition they have received in cash $94,400.23.

"These figures disregard the balances here found due from defendant Roth to plaintiffs. They, however, demonstrate that the interests of plaintiffs were well cared for these many years. Plaintiffs concede this fact. * * * Defendant G. W. Roth managed the farms. This meant not only leasing to tenants, collecting rents, dividing grain and the like, but also an active and intelligent supervision throughout. In the course of these years the farms were extensively improved, buildings and fences were built, wells dug, tile laid and improvements maintained. In addition defendant Roth made investments in loans for plaintiffs and renewed and collected these. He testified that about one-fourth of his time was occupied

with plaintiffs' mattèrs, one-third of his time during a five-year period when the tiling was being done. Even his wife did not question this statement. * * *

"Defendant Roth performed services which were valuable and very extensive. His duties carried responsibilities. Plaintiffs profited well by his efforts. The attitude of plaintiffs as to paying him for his labors in their behalf is little short of remarkable. Emma Patterson thinks that he was amply repaid for nearly 40 years of effort in her behalf by being received in the family and by reason of occasional Christmas gifts made by her to the Roths. Minnie Patterson thinks such services were fully repaid because Mr. Roth had the use of her money, for the use of which she is here demanding interest. The evidence to the effect that the services were gratuitous is far from convincing in view of the unreasonableness of such an arrangement.

"Had these services been charged on a yearly basis, defendant Roth would have had the benefit of a marked reduction in the interest now accumulated against him. * * * In all fairness he is entitled to compensation. The amount allowed seems to me reasonable. If I have erred in such an allowance it has not been on the side of liberality. * * *

"[With regard to the Iona farm], while, as a matter of convenience, the two farms were leased together, each party owned his or her tract individually. In effect, Mr. Roth managed his own farm and also managed plaintiff's farm. For his services in the latter undertaking he is entitled to be paid."

This disposes of the questions raised by plaintiffs. To us they all appear to involve questions of fact carefully considered and decided by the trial court and not to be disturbed by us.

Affirmed.

Mr. Justice Stone took no part in the consideration or decision of this case.

Mr. Justice Peterson, not having been a member of the court when this case was argued and submitted, took no part in its consideration or decision.