## HOLLANDALE MARKETING ASSOCIATION v. ARTHUR GOEMAT AND OTHERS.[1]

June 24, 1955.

No. 36,529.

---

[1]Reported in 72 N. W. (2d) 376.

*William P. Sturtz* and *Meighen, Sturtz & Peterson,* for appellant.
*Carl H. Lambach, Floyd E. Ensign,* and *Courtney A. Slife,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Action to recover money advanced by plaintiff, Hollandale Marketing Association, a co-operative marketing corporation, as agent for defendants in settlement of defendants' liability on certain written contracts for the sale and delivery to two Chicago produce firms of 20 carloads of U. S. No. 1 grade "Yellow Globe" onions. The trial court made findings and ordered judgment in defendants' favor in substance determining that the settlements made by plaintiff with the Chicago firms were unauthorized by defendants. This is an appeal from the trial court's order denying plaintiff's motion for amended findings or for a new trial, combined with an appeal from an order denying it leave to amend such motion.

On appeal plaintiff contends (1) the evidence compels a finding in its favor; (2) the court erred in receiving in evidence an escrow agreement made by the parties subsequent to the settlement and in placing reliance thereon in determining that the settlement was unauthorized by defendants; and (3) the court should have granted a new trial or amended its findings on the basis of newly discovered evidence.

In February 1951 defendants, operating a number of farms in southern Minnesota, engaged the services of plaintiff to sell on their behalf 30 carloads of U. S. No. 1 grade onions for delivery in November 1951 at $1.35 per bushel f.o.b. Hollandale. Plaintiff as their agent sold 15 of such carloads to Holland-Brodsky Company of Chicago and 15 carloads to National Produce Distributors, Inc., also of Chicago, on the terms specified. Identical contracts covering such sales were signed by the purchasers, by plaintiff as defendants' agent, and by defendants as growers. They included provisions that the grade was to meet Chicago Mercantile Exchange specifications; that a deposit of $100 per car was to be paid defendants in advance; that in the event of a crop failure the contracts were to be canceled and the deposits refunded; and that *"in event not possible to deliver U. S. One grade the grower shall deliver grade available, buyers option."* (Italics supplied.) The purchasers promptly forwarded to defendants the deposits totaling $3,000 for the 30 cars.

On October 20, 1951, plaintiff, through its general manager Joseph A. Boe, wrote defendants suggesting that they start grading and loading the onions for shipment under the contracts. He then advised them that "if U. S. #1 cannot be made, you shall be permitted to deliver what you do have, buyer's option. The buyers are all going to want delivery in full." On November 7 or 8, 1951, plaintiff's manager, Boe, visited defendants' warehouses and found the onions in poor condition. Between November 9, 1951, and November 16, 1951, defendants shipped ten carloads on the contracts. They fell substantially below the Chicago Mercantile Exchange specifications for U. S. No. 1 grade. On three of such cars plaintiff subsequently accepted payment for defendants at 75 cents per sack instead of

$1.35 specified for U. S. No. 1 grade, while settlements on the other seven cars handled by defendants directly netted them about 20 cents per sack, which was less than the cost of labor and material required to sack the onions. It was then clear that because of an inferior crop defendants would be unable to ship any cars of U. S. No. 1 grade onions under the contracts. Subsequent to shipment of the ten carloads described, on a number of occasions Boe advised defendant Christian Hansen that under the contracts defendants would have to ship the additional 20 carloads of onions; that, if they could not deliver U. S. one grade onions at the contract price, they would have to ship 20 carloads of inferior grade onions at such prices as could be negotiated with the Chicago firms.

On November 15, 1951, before the ten cars which had been previously shipped had been settled for as described, Hansen called upon Boe to ascertain the procedure leading to a cancellation of the contracts. He testified that he did this because of the previous statements of Boe relative to defendants' obligation under the contracts; that at the November 15th meeting he advised Boe that he did not agree therewith and stated further that he would ship no more inferior onions at the price the buyers proposed to pay for them; that upon Boe's assurance that an attorney's opinion confirmed Boe's construction, he then instructed Boe to ascertain what it would cost to bring about cancellation of the contract; that thereupon in his presence, Boe called the Chicago buyers and was advised by them that the cost of cancellation to defendants would be approximately 55 cents per sack, the difference between the current market price and the contract price on U. S. No. 1 grade onions; that he then told Boe that, if defendants were obligated to ship inferior onions as Boe contended, he "would have to try to get out." Asked if he then told Boe to cancel the contracts at the figures specified, he first replied: "I can't recall that I did. * * * I doubt very much that I did." "I told him I couldn't deliver No. 1 grade onions. * * * I was getting suggestions of ridiculous prices for these onions that was being delivered. * * * I told him that if I was in that kind of a mess I would have to try to get out." Pressed further as to whether

he then told Boe to cancel, he answered: "I * * * told him that I wasn't shipping any more. Whatever was necessary for me to get out, I wanted to do to get out." Later in his testimony he denied that he told Boe "to settle this matter," and "get * * * [him] out the best he could."

Boe testified that at the November 15th meeting, after being advised as to the cost of canceling the contracts, Hansen told him: "I think I will have you cancel. * * * I want to get out. I would like to have you buy in my contract"; that thereupon in Hansen's presence by telephone he advised the buyers to cancel the contracts at the figures mentioned and to deduct the loss, amounting to $6,498 after all credits and deposits were accounted for, from sums which the buyers then owed plaintiff on other transactions; and that Hansen then expressed relief that the contracts had been canceled, took out his checkbook, and asked if Boe wished payment of the loss at that time or if it might be postponed a few days and was told the latter course would be satisfactory. Hansen denied this and testified that at that time he had merely stated that he "would go to the bank at St. Ansgar" (where he kept his account) to see if he "could get some money" for the Chicago people.

On November 21, 1951, Hansen and his attorney called upon Boe to procure a release of $3,000 owed Hansen by plaintiff on other sales and held by plaintiff to apply on Hansen's indebtedness on the cancellations. Hansen's attorney advised Boe that they were not liable under the contracts and would not pay the $6,498 to plaintiff. Hansen testified that no claim was then made by Boe that Hansen had authorized the settlements described or that plaintiff had assumed any liability on defendants' behalf. On November 23, 1951, Hansen and his counsel returned to plaintiff's offices and to secure the release of the $3,000 submitted an agreement, whereunder Hansen agreed to deposit the sum of $6,498 in escrow to indemnify plaintiff against any liability arising out of the contracts "incurred in the handling thereof *in consequence of any instructions of Christian Hansen in respect thereto.*" (Italics supplied.) It further provided that:

"* * * The escrower is authorized and directed to pay said sum to Hollandale Marketing Association *in settlement of any such liability when, as, and if established and evidenced by final judgment.* In the event suit is brought against Hollandale Hansen agrees to defend such suit at his own expense. In the event non-liability of Hollandale is determined by adjudication or limitation this escrow shall terminate and deposit shall be returned to Hansen." (Italics supplied.)

After Boe had conferred with an attorney then representing plaintiff, the escrow agreement was executed by him on behalf of plaintiff and by Hansen.

Subsequently, defendants refused plaintiff's demand for payment of the $6,498 charged to plaintiff as the result of the settlements and this action followed. Defendants answered, denying they had authorized the cancellation or settlements described, and as a separate defense alleged that the "only agreement made between the parties * * * with reference to the written agreements [the sales contracts] * * * is * * * contained in the written escrow agreement entered into between the parties hereto in the fall of 1951; that no liability * * * exists under said escrow agreement at this time for the reason that the Chicago firms named therein have not established defendants' or plaintiff's liability to said firms under the written agreements [the sales contracts] * * *."

Shortly after commencement of trial, during the cross-examination of Boe, the escrow agreement was first offered in evidence but was rejected upon plaintiff's objection as to its materiality and relevancy. At the close of defendants' testimony, it was again offered, and this time over the same objection by plaintiff it was received. After defendants had rested, a recess was taken so that plaintiff might determine whether evidence in rebuttal should be submitted, but thereafter it rested without submitting further evidence or requesting continuance. In a memorandum attached to the findings ordering judgment for defendants, the trial court stated:

"* * * The effect of this [escrow] agreement is contradictory of the testimony of Mr. Boe. It is wholly inconsistent with a prior

settlement. According to this agreement of November 23, 1951, it would appear that no settlement had been made with the Holland Brodsky Co., or the National Produce Distributors, Inc., and the money to be held in escrow was only to be paid over in the event the liability of the defendants was determined by final judgment.

"The court determines that it must accept the implications of the escrow agreement, and determines that the plaintiff has failed to prove by a fair preponderance of the evidence that there was a settlement authorized by the defendants on November 15, 1951."

Subsequently, plaintiff moved for amended findings or a new trial. Before hearing thereon, it moved to amend this motion by including as an additional basis thereof the claim of newly discovered evidence. Both motions were denied. The evidence claimed to have been newly discovered was set forth in affidavits and related to the circumstances under which the escrow agreement had been executed by Boe and to the fact that plaintiff's counsel was unaware thereof until after the trial; and to confirmation, by representatives of the Chicago firms, of Boe's testimony relative to the telephone conversations authorizing cancellations of the contracts on November 15, 1951.

In his affidavit Boe set forth that after the trial for the first time he informed his counsel that he had been induced to sign the escrow agreement because of statements made by Hansen's counsel that it was intended merely as an accommodation to permit Hansen to bring legal action against the Chicago firms to have the contracts adjudged unenforceable and that it would not prejudice plaintiff's rights under the settlements authorized by Hansen; that, before signing it, he had called plaintiff's former counsel, repeating such assurances and had read portions of the agreement to him; that he had been advised by such counsel that, if the purpose was as stated and there was no intent to repudiate the settlements, there would be no harm in signing it; that, upon further assurances from Hansen's counsel to the same effect, he had signed the instrument for plaintiff; that at no time during such conversations did Hansen or his counsel deny that Hansen had authorized the settlements; and that thereafter no action was commenced against the Chicago firms by defend-

ants, and when it became apparent they never intended to, the present action against them was instituted.

Plaintiff's present counsel in his affidavit confirmed Boe's statement that he was first advised of such facts after the trial and that reception of the agreement toward the close of the trial after it had first been rejected left him without ample opportunity to inquire as to the circumstances attending its execution.

■ Ordinarily an agent is entitled to reimbursement and indemnity for expenses, losses, and liabilities incurred by him on behalf of his principal (Sinclair Coal Co. v. Pittsburgh & Ashland C. & D. Co. 178 Minn. 114, 226 N. W. 206; Yeates v. Young, 150 Minn. 274, 185 N. W. 257; Monroe v. Rehfeld, 132 Minn. 81, 155 N. W. 1042; Hoch v. Duluth Brewing & Malting Co. 173 Minn. 374, 376, 217 N. W. 503, 504, 56 A. L. R. 970, 972; Restatement, Agency, § 439; 8 Am. Jur., Brokers, § 196; 12 C. J. S., Brokers, § 77) ; and conversely an agent may not recover for losses incurred because of a failure to follow the principal's instructions, or for payments made for the principal but without the latter's authority. Drake-Jones Co. v. Drogseth, 188 Minn. 133, 246 N. W. 664; Veltum v. Koehler, 85 Minn. 125, 88 N. W. 432; see, Restatement, Agency, § 440; 8 Am. Jur., Brokers, § 196; 12 C. J. S., Brokers, § 77. Based on such well-established principles it is clear that in the instant case plaintiff's right of indemnification from defendants on account of the indebtedness incurred by it because of cancellation of the contracts would depend upon the instructions given to Boe by Hansen at the November 15, 1951, conference in plaintiff's office. If the cancellations were not authorized by defendant of course plaintiff would not be entitled to recover.

■ The trial court found that "The claimed settlement of the plaintiff with the Holland Brodsky Co., and the National Produce Distributors, Inc., and with each of them was *unauthorized* by the defendants, and was without the consent and approval of the defendants or any of them." (Italics supplied.) In its memorandum the court made clear that this finding hinged solely upon the implications of the escrow agreement, which at first had been rejected as irrelevant evidence on this issue. While some weight should be given this agreement as a possible manifestation of the parties' intent

162

(Wallace v. Joseph Dixon Crucible Co. 223 Minn. 162, 25 N. W. [2d] 465; Mueller v. Chicago & N. W. Ry. Co. 194 Minn. 83, 259 N. W. 798; 3 Corbin, Contracts, § 558, pp. 145 to 146; 4 Dunnell, Dig. [3 ed.] § 1820), we feel it should not be considered controlling here.

■ There is so much doubt as to its purpose and such apparent conflict between its provisions and much of the credible evidence that, in the interests of justice, full consideration should be given to all facts surrounding its execution and to all declarations of the parties connecting it with their conversations of November 15, 1951. On the present record, it obscures rather than clarifies the issue of authorization. It speaks of indemnifying plaintiff against *any* liability incurred in the handling of the contracts "in consequence of any instructions of Christian Hansen in respect thereto." What instructions of Hansen other than those directing cancellation of the contracts would create liability on the part of plaintiff? Or does the agreement tend to establish that Hansen had advised Boe to cancel the contracts but later hoped that by some action to be instituted against the buyers liability because of such instructions could nevertheless be eliminated. The agreement provides for indemnifying plaintiff for liability established by final judgment. As indicated above, it was this provision which tipped the scales in defendants' favor on the issue of authorization. But would not such language be consistent with a proposal by defendants that both plaintiff and defendants might escape liability if defendants were to institute some type of action against the buyers in plaintiff's name—the same proposal subsequently made by defendants' counsel in a letter to plaintiff's counsel—and that if such suit resulted in a judgment against plaintiff, defendants would then indemnify it because thereof? Likewise, was it not compatible with defendants' thought that an action for breach of contract instituted by the buyers against plaintiff could be successfully defended; and that if not they would reimburse plaintiff for any judgment obtained against it therein—both parties overlooking the fact that rather than instituting such a suit the buyers would merely deduct their losses from sums then owed to plaintiff. It is incredible that Boe would have executed the agreement with full understanding that it. precluded plaintiff from proceeding against

defendants for an indebtedness already charged against plaintiff in a transaction entered into solely for defendants' benefit, and in which plaintiff at no time stood to gain anything except the negligible commissions allowed it on consummated sales.

It is urged that notwithstanding the escrow agreement there is evidence sufficient to support the court's finding on the issue of authorization. Reference to its memorandum, however, indicates that the escrow agreement and the inferences sought to be drawn therefrom in the court's mind resolved whatever doubts may have existed on this issue. Examination of Hansen's testimony readily explains this. He testified that after hearing Boe's conversations with the buyer on November 15, 1951, he advised Boe that he "wasn't shipping any more" and that "whatever was necessary for me to get out, I wanted to do to get out." Such statements made after the cancellation figures had been received, and during the process of negotiations with the buyers in Hansen's presence, would seem to be almost conclusive on this issue. When they are taken with Hansen's repeated assertions that he could not "recall" what he said, or that he "doubted" if he had instructed Boe to cancel, and reference is made to other surrounding facts and circumstances, we cannot escape the conclusion that, exclusive of the escrow agreement, the evidence, on the present record, is such that a finding in plaintiff's favor was certainly warranted if not compelled thereon. National Pole & Treating Co. v. Gilkey, 182 Minn. 21, 233 N. W. 810; see, 1 Dunnell, Dig. (3 ed.) § 411. Because of this agreement, however, we hesitate to finally determine the matter at this time. It is our conviction that all facts and circumstances surrounding its execution should be received and considered by the finders of fact before the principal issue can be justly determined and that accordingly a new trial must be ordered. At that time all such evidence can be weighed and, if desired, the parties may also submit for determination issues, if any, relating to claimed misrepresentations as to defendants' liability on the contracts and as to the purpose and conditions of the escrow agreement.

The orders appealed from are reversed and a new trial granted. Reversed.