MINNESOTA FARM BUREAU MARKETING CORPORATION,

v.

NORTH DAKOTA AGRICULTURAL MARKETING ASSOCIATION, INC., a North Dakota Corporation, etc., Appellee,

v.

Richard A. LARSEN, Appellant.

No. 76–2045.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 31, 1977.

Decided Oct. 17, 1977.

Before ROSS, STEPHENSON and HENLEY, Circuit Judges.

ROSS, Circuit Judge.

In February 1976, Minnesota Farm Bureau Marketing Corporation (hereinafter MFBMC) was awarded a judgment against North Dakota Agricultural Marketing Association (hereinafter NDAMA) due to NDAMA's failure to fulfill contracts for the sale of grain.[1] NDAMA in turn made several farmers, who had failed to deliver grain, third-party defendants; among them was Richard Larsen, the appellant. Larsen had delivered six loads on his contract but failed to deliver the balance agreed upon.

NDAMA contended that it had served only as the farmers' agent for the purpose of procuring buyers for the farmers' grain, and that upon the farmers' failure to deliver the grain to MFBMC, the buyer, and the agent's subsequent payment of damages to the buyer in the initial suit, the farmers as principals became obligated to indemnify their marketing agent, NDAMA. After trial to a jury the trial court adopted NDAMA's theory, and on post-verdict motion ordered that NDAMA be indemnified for the sum it had paid out in damages, less any counterclaims which the farmers could prove. Only one farmer, Richard Larsen, appeals the judgment. We affirm.

*Agency*

■ The jury determined that Larsen and NDAMA were principal and agent respectively, and were not a seller and a buyer in this transaction. The trial court refused to upset this finding in Larsen's post-verdict motion, and we agree that sufficient evidence supports it. With respect to NDAMA's agency status, the trial court made the following conclusions which accurately reflect our reading of the transcript:

Herbert L. Meschke, Minot, N. D., argued, concluded argument and filed brief, and appendix, for appellant.

John M. Nilles, Fargo, N. D., argued, and Frank J. Magill and Stephen W. Plambeck, Fargo, N. D., on brief, for appellee.

1. According to the district court opinion in this case, NDAMA was found liable to MFBMC in the original action "because it was acting either as a principal or an undisclosed agent for the farmers."

    NDAMA is a corporate association of members of the North Dakota Farm Bureau organized to assist its members in the marketing of their farm production. According to the membership agreement, a membership "allows the member to use at his discretion the services of North Dakota Agricultural Marketing Association, Inc. in marketing his agricultural production through, but not limited to, direct sales, marketing contracts, and hedging."

It is undisputed that all the Third-Party Defendants contacted NDAMA to obtain a buyer for their grain at a certain price. * * * Each of them received from NDAMA copies of the confirmation of sale to MFBMC which specifically stated: "We confirm your sale of . . . today to . . ." The confirmation designated the kind of grain and the buyer in each case. There is evidence the farmers accepted the confirmation.

Under North Dakota law, "[a]gency is the relationship which results where one person, called the principal, authorizes another, called the agent, to act for him in dealing with third persons". NDCC § 3–01–01 (1975). Under the law of agency, the evidence recited above was sufficient to sustain the finding of the jury that a principal-agency relationship was created. Third-Party Defendants further contend there was no agency relationship as a matter of law because they had no control over the activities of NDAMA once the contracts were formed. * * * There is evidence from which the jury could find the farmers did not intend to sell their grain to NDAMA nor did the latter intend to buy their grain at any time. Further, there is evidence from which the jury could find the farmers solicited the services of NDAMA specifically to find third parties who could buy their grain.

The Third-Party Defendant farmers reserved as much control over NDAMA's actions as they wished. Before NDAMA completed the assignments for which it was employed, the farmers could have revoked their authority. NDCC § 3–01–11 (1975). The principals did not reserve authority to name the buyers who could be solicted by NDAMA. They did retain control over the quantity of grain to be sold and the price for which it would be sold.

The Court is not free to weigh the evidence and set aside the verdict of the jury merely because the jury could have drawn different inferences or conclusions or because the Court may feel that other results are more reasonable. * * *

Though at trial Larsen denied knowing the sale of his grain was to Minnesota Farm Bureau Marketing Corporation, and not NDAMA, testimony at trial also shows that Larsen called NDAMA on May 21, 1973, in an effort to find a buyer for the 12,000 bushels of durum, that NDAMA returned a call to Larsen on May 22, 1973, quoting the price and terms then available, and that Larsen orally accepted. A written confirmation on an NDAMA confirmation form dated May 22, 1973, was then sent to Larsen within a few days of the phone call; it stated: "We confirm your sale of durum today to Minnesota Farm Bureau Mkt."[2]

Viewing the evidence from the limited perspective afforded an appellate court, and in the light most favorable to the verdict, we conclude that the trial court correctly upheld the determination of the jury on the issue of agency.[3] Likewise, we

---

2. Larsen admitted receiving the confirmation, but testified that he "didn't read that part of it" and didn't know the six loads he did ship under the contract were being shipped to MFBMC; however, Larsen's statement of account from NDAMA also identifies the sales as being to MFBMC. The documentary evidence and the testimony of Mr. James Elliott, manager of the marketing association, as well as portions of Larsen's testimony, reveal facts and inferences sufficient to support the jury's finding of agency. "The question of the existence of an agency and the scope and extent of the agent's authority is to be decided from all facts and circumstances in evidence and is primarily a question of fact for the jury." *Leonard v. North Dakota Co-operative Wool Marketing Ass'n.,* 72 N.D. 310, 6 N.W.2d 576, 578 (1942).

3. Larsen's contention that the court permitted improper proof on the fact of agency is rejected. "[T]he testimony of any person who has requisite knowledge is admissible to prove the fact of agency." *Stockmen's Ins. Agency, Inc. v. Guarantee Reserve Life Ins. Co.,* 217 N.W.2d 455, 462 (N.D.1974).

Where an agency can be established by parol, the agent is a competent witness to prove it and the extent of his authority. 10 Ency. of Evidence, pp. 14, 15. The rule that counsel for the defendant apparently had in mind is the one which inhibits the fact of agency and the extent of authority from being proven by the declarations of an agent. 10 Ency. of Evidence, pp. 15–20. This latter rule, of course, has no application here. For here there was no attempt to prove the fact of

are not persuaded from our reading of the record that the trial court abused its discretion in failing to grant Larsen a new trial. *Lincoln Carpet Mills, Inc. v. Singer Co.*, 549 F.2d 80, 81–82 (8th Cir. 1977).

Larsen contends, however, that in any event he did not receive a *fair trial* on the agency issue. He makes the following allegations of error:

(1) the trial court refused to use Larsen's proffered instruction on control of the agent by the principal;

(2) the trial court refused to admit into evidence jury finding XV in the prior action between MFBMC and NDAMA;

(3) the court excluded evidence of prior contracts between the farmers (not Larsen) and NDAMA, which were clearly *buy-sell* agreements;

(4) the court excluded from evidence a footnote from an auditor's report which identified certain grain contracts as NDAMA's contracts to purchase grain from farmer members without reference to NDAMA's agency status;

(5) the court excluded from evidence state court pleadings in suits commenced by NDAMA against other individual third-party defendant farmers.

We answer these contentions in order.

Larsen's requested instruction on "control" is taken from a comment in the Restatement Agency 2d which supplements the Restatement *definition* of agency. This single sentence,[4] taken from the lengthy comment, is an explanatory statement of the *general* § 1 definition which reads: "(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall

act on his behalf and subject to his control, and consent by the other so to act."

■ Aside from the observation that it may be taken out of context, Larsen has not cited any authority which would indicate that it was error to omit the proffered instruction under North Dakota law. Having reviewed the instructions in their entirety, we are persuaded the instructions as given by the trial court correctly restate the North Dakota statutory and case law. *See, e. g.*, N.D.Cent.Code 3–01–01; *Tostenson v. Ihland*, 147 N.W.2d 104, 109 (1966); *Lander v. Hartson*, 77 N.D. 923, 47 N.W.2d 211, 214–15 (1951).

■ We reject the contention that the court improperly exercised its discretion in not admitting its finding XV. That finding, from the initial portion of the suit against NDAMA states: "In connection with said contracts NDAMA at all times dealt with MFBMC as a principal." Finding XV is not, as Larsen contends, required to be introduced pursuant to Fed.R.Evid. 106[5] simply because the trial court had introduced findings IV, V, VI, and VII. These four findings, relating to each of the third-party defendant farmers, establish in Larsen's case that MFBMC and NDAMA entered into a contract for 12,000 bushels of durum, that NDAMA did not deliver approximately 7,300 bushels and had breached the contract, and that the breach required MFBMC to effect cover. NDAMA thereby became indebted to MFBMC in the amount of $41,645.24. These findings were admitted as evidence of the amount of indebtedness, and we conclude that no misleading impression was created by failing to intro-

---

agency or the extent of authority by unsworn declarations or statements made by the alleged agent out of court.

*Motley v. Standard Oil Co.*, 61 N.D. 660, 665–66, 240 N.W. 206, 207 (1931). Once the fact of agency has been independently proved, the agent's "statements, declarations and proof of his acts" within the agent's authority may be introduced against the principal. *See Rigler v. North Dakota Const. Co.*, 57 N.D. 37, 42, 220 N.W. 441, 442 (1928).

**4.** It is the element of continuous subjection to the will of the principal which distinguishes

the agent from other fiduciaries and the agency agreement from other agreements. Restatement (Second) of Agency § 1, comment b (1958).

**5.** Federal Rule of Evidence 106 provides:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

duce finding XV as well. *See* Fed.R.Evid. 106, Note of Advisory Committee.

Finding XV was also relevant, Larsen argues, under Restatement Agency 2d § 14J, comment b, which makes a transferee's (NDAMA) dealing in his *own name* with another's goods one of seven factors indicating a *sale*. However, the trial court did instruct that dealing in one's own name was a factor indicating a sale, and there was evidence to support that instruction. Moreover, the court had also instructed that "under the law North Dakota Agricultural Marketing Association could have been an agent of a Defendant, and as agent for a Defendant *acted as a principal in its dealings with Minnesota Farm Bureau Corporation*." (Emphasis added.) Larsen has not assailed this as an incorrect statement of the law, and its inclusion diminished the probity of finding XV for his argument.

■■■ We also conclude that the trial court did not abuse its discretion in refusing to admit the prior buy-sell agreements entered into between NDAMA and farmers Faul and Howey. The trial court has broad discretion in determining the relevancy of proposed evidence. *United States v. Johnson*, 516 F.2d 209, 214 (8th Cir. 1975). The grain contracts in question were dissimilar to the documents involved in this transaction and Larsen was not a party to any of these previous sales agreements.

■■■ We likewise uphold the district court's discretion in excluding, for foundational reasons, footnote twelve of an auditor's report on NDAMA in which a CPA firm stated that "[t]he company has *unrecorded contracts* totaling approximately $450,000 *to purchase grain from North Dakota Farm Bureau members*, wherein these farmers are to deliver grain to a selected grain terminal in the company's name." (Emphasis added.) The accountants' characterization of these transactions as "contracts * * * to purchase grain" was not adequately shown by Larsen to be related to a matter within the scope of their agency. The fact and scope of the declarant's agency must be proved. McCormick, Evidence § 267, at 642 (1972); *United States v. Ojala*, 544 F.2d 940, 946 (8th Cir. 1976).

■■■ The appellant's cited authority does not persuade us that the trial court abused its discretion in refusing to admit, as a factual judicial admission, NDAMA's state court complaints against farmers *Howey* and *Faul*, which pleaded that NDAMA and Faul, and NDAMA and Howey, had entered into a "contract" for the "purchase" of durum.

## Indemnification

Larsen's major contention on this appeal is that, regardless of an agency relationship, he should not be liable to indemnify NDAMA because of the jury's finding that NDAMA had substantially breached its contract with Larsen. The jury had answered "yes" to the following special interrogatory: "Did North Dakota Agricultural Marketing Association breach its contract with Richard A. Larsen, and, if so, was such breach so substantial that Richard A. Larsen was thereby justified in his failure to deliver the grain?"

After the verdict, however, the trial court concluded that this particular question was irrelevant to Larsen's indemnity liability, once agency was established:

It was proper to submit to the jury the determination of whether the relationship was that of agency or buyer-seller. * * * With the finding that an agency existed, general principles of agency law became applicable.[1] The law requires a principal

[1] NDMA having elected to abandon all claims except its claim for indemnity, the only issue for the jury to decide was whether the contract between NDAMA and each of the third-party defendants created a principal-agent or a seller-buyer relationship. The interrogatories, except Interrogatory No. 1, were irrelevant. The Larsen counterclaim was conceded by NDAMA.

to indemnify an agent for damages it incurs resulting from the principal's failure to perform under a contract created by the agent on behalf of the principal if to do so was within the scope of his authority. * * * Therefore, NDAMA is entitled as a matter of law to indemnity from each Third-Party Defendant on

the full amount of its loss, reduced by any amount the Third-Party Defendant can show that actions by the agent caused him loss. (Citations omitted.)

Larsen urges that this is error, and that the following allegations of breach by NDAMA justified his refusal to deliver the grain: (1) Larsen allegedly encountered significant delays in making deliveries at the Superior, Wisconsin delivery point designated by NDAMA; (2) Larsen allegedly was assessed excessive discounts and dockage on the grain he did deliver, and NDAMA allegedly did not suggest to Larsen that he deal directly with MFBMC when he complained of these matters; (3) NDAMA had refused to pay Larsen for the last load of grain delivered.

■ Even if we were to accept Larsen's legal argument that these allegations justify his "rescission" and his refusal to deliver the grain, the first two allegations are not supported by the facts, and Larsen is entitled to neither a rightful rescission nor a larger setoff for damages. Larsen's written confirmation of the sale arranged by NDAMA clearly states that "Producer furnishes transportation" to the Superior, Wisconsin destination; at trial Larsen readily admitted that he was to pay the cost of transportation, and that NDAMA had no obligation to provide him with transportation. Larsen's testimony indicates that the trucker he hired to haul the grain wanted more money because of the delay in making deliveries at that time at Superior, at the head of the Lakes; when Larsen would not pay the trucker a higher rate, he quit. Although it was not obligated to, NDAMA located trucks for Larsen as late as December 1973; at trial Larsen conceded that he and Rice, on behalf of NDAMA, were still "talking about trucks" and about "performance on the contract" at that time. On this set of facts it is not clear how Larsen contends that NDAMA breached a contractual obligation or caused Larsen a loss which NDAMA should bear.

The second allegation of breach, which concerns excessive discounts and dockages, also lacks support in the record. Discount factors on the confirmation form sent to Larsen provided as follows:

"13.50 mst, 4¢ disc for Amber grade
7¢ disc for Durum grade
Market scale of discount other factor."

According to the testimony of Mr. Elliott, NDAMA manager, the bid he receives from a potential buyer like MFBMC includes a market quote of what the buyer would be willing to pay for a particular grain plus "the premiums, discounts, [and] destination elevator." He further testified that the 4¢ discount for amber grade and the 7¢ discount for durum grade in this case were rates set by MFBMC in its bid. These particular discounts are set as a result of supply and demand for a particular type of durum. The grading of the grain to determine the applicability of these discounts was done by a private laboratory supervised by the State of Wisconsin. Other discount factors set at the market time of arrival are established by the standards of the Grain Standards Act and are assessed during the official grade of the durum, which is supervised by the State of Wisconsin. The market factors in grading include "damage," "foreign material," "contrasting classes" (a different type of grain in the sample), "shrunken and broken discount," "total defects," "test weight discount," and "sour odor discount." Mr. Elliott, whom the court accepted as an expert witness, testified that the discounts on Larsen's six loads were "not abnormal," but were "about average, with the possible exception of the sour discount * * *."

On the grain shipments Larsen refused to deliver to MFBMC, but instead sold in Westby, Montana, he received approximately the same *dockage* as on the six truckloads delivered to MFBMC.

Larsen complains that NDAMA never suggested to Larsen that he should "deal directly with or complain directly to MFBMC about these problems." However, when Larsen called Elliott in early July 1973, Elliott said he explained "who graded the grain and why the various discounts were taken * * *"; Larsen testified he told Elliott he "wasn't satisfied with the

price and the dockage" but also testified that "[t]he dockage wasn't [bad], but the price was."

As to price, Larsen testified he had wanted to net at least $1.88 per bushel on the sale to MFBMC; in fact, the lowest net price per bushel received by Larsen was $2.03. The evidence concerning dockages and discounts proves that no loss was sustained by Larsen which NDAMA caused by a breach of its agency contract.

Larsen's third allegation of substantial breach of contract relates to NDAMA's failure to pay Larsen for the last load he delivered. It is clear that NDAMA owed Larsen for the last load, delivered about July 1, 1973, and NDAMA conceded it should offset the amount of $1,678.12 plus interest against its award of indemnity. It is not clear, however, that NDAMA's refusal to pay amounted to a substantial breach of contract or precipitated Larsen's refusal to send more grain. Elliott testified that it was NDAMA's policy to withhold payment on a previous load until receipt of another bill of lading, and that NDAMA held the check waiting for Larsen to deliver the next load.

[11] The trial court correctly concluded that the agent's failure to pay for the last delivered load, and other allegations of breach by the agent, did not justify Larsen's refusal to deliver grain under its contract with MFBMC.

NDAMA, on behalf of each individual principal, established a separate contract between the principal and MFBMC. The principal was contractually obligated at that time to deliver grain to MFBMC. Any action or "breach" by NDAMA thereafter did not alter the principal's obligation with MFBMC to deliver under that grain contract.

In this case Larsen gave NDAMA the authority to find a buyer for his grain; NDAMA did so and Larsen accepted the terms of the offer its agent had solicited. Under these circumstances, the principal should be liable to indemnify the agent for the principal's failure to perform the contract which he had authorized the agent to enter into. See Restatement (Second) of Agency §§ 438, 439 (1958). There is no allegation that NDAMA breached its agency contract with respect to the manner in which it procured a contract for its principal.

*Sunset-Sternau Food Co. v. Bonzi*, 60 Cal.2d 834, 36 Cal.Rptr. 741, 389 P.2d 133 (1964) is authority on this point. There the plaintiff, Sunset-Sternau, acted as agent for the defendant Bonzi in the procurement of a buyer for Bonzi's apricot kernels. Pursuant to the agreement, plaintiff elicited an offer from a third party buyer, and obtained the approval from the undisclosed principal, Bonzi, to enter into a contract on those terms, in the agent's own name. When fire destroyed a substantial portion of the California apricot pit and kernel stock, the price rose rapidly and the defendant did not deliver on the contract. The buyer successfully sued the agent who in turn sought indemnity, which the court awarded:

> [A]n agent who becomes personally liable for the performance of a contract which he has undertaken for his principal may hold the principal for indemnity for damages sustained because of breach of that contract.

*Id.* 36 Cal.Rptr. at 744, 389 P.2d at 136. *See also Differential Steel Car Co. v. MacDonald*, 180 F.2d 260, 270 (6th Cir. 1950); *Hollandale Marketing Ass'n v. Goemat*, 245 Minn. 154, 72 N.W.2d 376, 380 (1955). The cases which appellant would have us rely on, *In Re Lathrop, Haskins & Co.*, 216 F. 102, 104–06 (2nd Cir. 1914); *First Mid America, Inc. v. Palmer*, 197 Neb. 224, 248 N.W.2d 30, 33–35 (1976), are not apposite. NDAMA does not seek to recover losses it sustained due to its own breach or fault or failure to perform its duties as an agent; NDAMA sustained a loss because Larsen failed to deliver the grain as promised.

We agree with the trial court that having decided that NDAMA and Larsen were principal and agent, and that NDAMA acted within the scope of its authority in procuring the contract, Larsen should be indemnified for the judgment rendered

against it. While Larsen's obligation should be reduced by any losses which NDAMA caused, we agree that he has proved entitlement to a reduction of $1,678.12 plus interest.

Larsen further argues that in any event NDAMA's award of indemnity should be reduced because NDAMA should have effected cover in Larsen's behalf prior to the time MFBMC covered on September 20, 1973. Larsen had requested special interrogatories submitting to the jury the reasonableness of NDAMA's actions concerning a substitute purchase of grain; the trial court did not submit the same questions but did ask the jury to answer a similar question, and instructed them as follows:

There is a rule of law commonly known as the doctrine [of] avoidable consequences which requires a person injured by the wrongful act of another to exercise reasonable care to avoid loss or minimize the resulting damages and also requires a party to a contract, who is subjected to injury by the breach of the other party, to make reasonable efforts and exercise ordinary care and diligence to reduce the resulting damages. However, this rule is not applicable where the party whose duty to perform a contract has equal opportunity for performance and equal knowledge of the consequences of nonperformance. As applicable to this case at the time that North Dakota Agricultural Marketing Association knew, or from the information available to it should have known, that a defendant was not going to deliver the grain required by the contract, under the doctrine of avoidable consequences it had the duty to make reasonable effort and exercise ordinary care and diligence to reduce the damages unless the defendant had equal opportunity to do what the plaintiff could have done and equal knowledge of the consequences of failure to do it.

The jury did not reach these special interrogatories on "cover" because of its affirmative answer to the second question, that NDAMA had substantially breached its contract with Larsen which *justified* his *failure* to deliver the grain.

However, as discussed, *supra*, the trial court decided post-trial that the answers to all questions submitted to the jury except the first question, whether the parties were principal-agent or buyer-seller, were "irrelevant." The trial court held that once it was decided that the parties were principal and agent, the agent was entitled to indemnity *if* the contract created on the principal's behalf was within the scope of the agent's authority. As to the truth of this fact, the court apparently felt reasonable minds could not differ. The question of the agent's duty to cover or mitigate the principal's damage was not addressed again by the court in the post-verdict memorandum.

The appellant has cited no authority to us to support its proposition that the agent had a duty, acting within the scope of its authority, to mitigate the damage caused by the *principal's* breach of its contract with a third party, or that the agent had a duty under these circumstances to effect cover; however, assuming such a duty to mitigate existed, Elliott of NDAMA has testified that Larsen never told him prior to the time MFBMC covered that he would not deliver on the contract or that he had already sold the grain promised to MFBMC. Larsen disputed this statement in his testimony, but, as we have noted, also conceded that he and NDAMA were still discussing truck transportation as late as December.

Moreover, Larsen has not convinced us that the doctrine of avoidable consequences was inapplicable. That rule requires that Larsen also attempt to mitigate damages if he had an equal opportunity to perform the contract and knowledge of the consequences of nonperformance. The record is clear that Larsen's 1973 durum crop was harvested and could have been used to fulfill the contract, even after he had sold the grain originally promised to MFBMC.

The statute of frauds is Larsen's final defense to the enforcement of the agency contract. Larsen argues that he never signed the confirmation form, although NDAMA asked him to do so and to return the document. The defense is properly denied.

Under North Dakota's UCC section 41–02–08, a contract for the sale of goods for a price of five hundred dollars or more is not enforceable unless there is a writing sufficient to indicate that a contract for sale has been made and signed by the party against whom enforcement is sought or by his authorized agent. While the agency contract between NDAMA and Larsen was not a contract for the sale of goods under the UCC, North Dakota statutory law requires an authorization to enter into a contract to be in writing if the underlying contract is one required to be in writing.

3–02–06. *Form of Authorization.*—An oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing * * * can be given only by an instrument in writing.

NDAMA relies on the California case discussed earlier, *Sunset-Sternau Food Co. v. Bonzi, supra,* 60 Cal.2d 834, 36 Cal.Rptr. 741, 389 P.2d 133, involving the California version of the statute, which is identical in all material respects. In a well-reasoned opinion, Justice Tobriner concluded that this statute, requiring written authorization, should protect the principal from enforcement of the sales contract by the third party, but should *not* prevent enforcement of the agency agreement by the agent, or foreclose indemnity. We are uncertain how the Supreme Court of North Dakota would interpret the authorization statute in a case involving the sale of goods; however, there is an alternative basis for our holding that the statute of frauds should be avoided.

█ The North Dakota court has applied the doctrine of promissory estoppel as an exception to the strict application of the statute of frauds. *Farmers Cooperative Ass'n of Churches Ferry v. Cole,* 239 N.W.2d 808, 812 (N.D.1976). We feel that the facts as developed in this case are sufficient to satisfy the elements of promissory estoppel as outlined in the North Dakota court in a case involving a contract for the sale of goods. Under the guidelines of that case a party may be estopped if his conduct "is calculated to convey the impression that the facts are otherwise than those which the party subsequently attempts to assert"; if there is an intention or expectation that such conduct will be acted upon or influence the other party, and if the estopped party has actual or constructive knowledge of the real facts.

█ The party claiming estoppel must show lack of knowledge of the truth as to the facts in question, good faith reliance on the other party's conduct or statements, and action or inaction resulting in a prejudicial change of position. Larsen by his own admission represented to NDAMA that he would sell 12,000 bushels at a stated price, and in fact partly performed by delivering six loads on the contract. NDAMA had no reason to believe that Larsen would not continue to deliver on the contract negotiated in Larsen's behalf. Throughout the fall NDAMA called Larsen and discussed truck transportation with him in an effort to have him perform; NDAMA offered to help Larsen arrange the transportation and Larsen admitted that one conversation went to the extent of giving directions to the farm.

█ NDAMA relied to its detriment on Larsen's representation that he would sell the grain, and immediately found a buyer, to whom it was later required to pay damages. *Jamestown Terminal Elevator, Inc. v. Hieb,* 246 N.W.2d 736 (N.D.1976). Applying estoppel principles to the agency agreement, we conclude that Larsen is estopped from relying on the statute of frauds as a bar to the enforcement of the agency contract.

The judgment is affirmed.